SHEEGOG, *et ux., v.* PERKINS, *et al.*

1. GIFT CAUSA MORTIS. A gift *causa mortis* must be made in the conceived approach of death. A general apprehension of death from the mortality of man will not be sufficient, but it must be an apprehension arising from the peculiar sickness, peril, or danger.

Case cited; Gass, Adm'r, *v.* Simpson, *et als.,* 4 Cold., 289.

Authorities cited: Miller *v.* Miller, 3 P. Wms., 356; Lawson *v.* Lawson, 1 P. Wms., 441; Walker *v.* Hodge, 2 Swanst, 100; Raymond *v.* Sellick, 10 Conn., 480; 2 Bl. Comm., 514.

2. INTER VIVOS. *Parol trust.* If the intention to make a gift *inter vivos,* or to declare a trust in favor of the wife, be not clearly made out, it cannot be supported. If the matter be enveloped in doubt, that doubt must prevail against the hypothesis of a gift—especially where creditors are to be obstructed or postponed in the collection of their debts.

Authorities cited: Wells *v.* Spencer, 3 Binney, 366; Miller, *et ux., v.* Jeffries, *et al.,* 4 Gratt, 472.

---

### FROM MAURY.

---

Appeal from the Chancery Court.

No record of this case can be found.

SNEED, J., delivered the opinion of the Court.

The sole question presented in this case is as to the ownership of a sum of money, in gold coin, amounting to $5,258, which the complainant's intestate, Constantine Perkins, in his life-time, deposited specially in the Planter's Bank at Nashville, in the summer of 1864.

18—VOL. 4.

The complainant, Mrs. Sheegog, was the widow of Constantine Perkins, and has become the wife of Mr. Sheegog pending this litigation. Mr. Perkins died intestate, on the 24th of November, 1864, and his widow, Nancy R., the complainant, became his administratrix. She claims the gold in controversy as a gift from her said deceased husband during his life-time, and it is urged in argument on her behalf, that under the facts, the claim must be sustained either as a gift *inter vivos*, a gift *causa mortis*, or upon the theory of a declaration of a trust on her behalf, which a Court of Equity will uphold. The intestate died without issue, leaving the complainant the sole distributee of his per- sonal estate. His heirs at law are his brothers and sisters, and the descendants of such as are dead. He left a considerable estate, consisting of real and per- sonal property; the latter consisting in the main of notes and accounts and other choses in action. His estate was considerably indebted, and without the gold in question, it appears that the personal assets will not pay the debts; and a doubt is intimated whether, without the funds in controversy, the real estate itself will discharge the indebtedness; but this does not very clearly appear.

In her cross-bill * in the cause, the complainant asserts her claim to the gold in question, and admits that as administratrix she had embraced the gold in the inventory rendered by her; but says in reference

---

* The defendants filed a cross-bill, and the complainant answered this by cross-bill.

Sheegog *v.* Perkins.

thereto, that at the time she rendered the inventory "she was not informed of the facts, or of her legal rights to said deposit." It is manifest, however, from the proof, that by this averment she did not intend to be understood as meaning that she was asserting her claim for the first time in her cross-bill, or at a time subsequent to the rendering of the inventory, as the liberal terms employed would seem to import. The proof shows that she did assert her claim to the deposit before her inventory was prepared; that she consulted her attorney in reference to the gift, as to the propriety of including it in the inventory, claiming it as her own, and that he, being of opinion that there would be ample personal assets without it to discharge the debts, advised her to include the deposit in the inventory, as she, being the sole distributee, would be likely to get it in any event.

The proof shows that Constantine Perkins returned in the spring or summer of 1864, from Arkansas to his home near Columbia, bringing with him a large amount of United States currency. The country at the time was in great disorder—the civil war then flagrant—and in the section where he lived both life and property were very insecure. He came to Nashville and converted a large amount of his currency into gold, and deposited a tin lock-box of gold coin in the Planter's Bank, with instructions to the cashier to keep the same, on special deposit, and to deliver it to no one but himself, and in the event of his death to no one but his wife. His state of health at the time

was precarious and feeble. He had been admonished by his physician some time before that he could not live long. He was, however, in a condition to attend to outdoor business, and was at the time contemplating another journey to Arkansas during the winter next thereafter. Having made the deposit as aforesaid, he returned to his home, and delivered the key of the tin box to his wife, the complainant.

Mrs. Owen, a niece of complainant, testified that she lived in the family of Constantine Perkins at the time of his death; that he brought back from Arkansas, in the summer of 1864, about §32,000 of greenback currency; she saw him take it off his person. About July, or August he invested the larger portion thereof in gold. A short time before she heard him say in presence of Mrs. Perkins, in family conversation, that he intended to invest the money in gold, so that in the event of any accident happening to himself, or in case of his death, the sum could be used for the maintainance and benefit of his wife. After he returned from Nashville, the witness was informed by Mrs. Perkins that she had the key to a box of gold belonging to Mr. Perkins which Mr. Perkins had given her. The witness marked the key for her to distinguish it from others. " I know," said the witness, " that Mr. Perkins allowed Mrs. Perkins to keep the key to the box of gold in the possession of D. Weaver, cashier; that at one time he went to Nashville, and did not take the key out of her possession; that said key was in Mrs. Perkins' possession a short time before Mr.

Perkins' death," and to the knowledge of the witness was never out of her possession. The health of Mr. Perkins was never good. He spoke of the uncertainty of surviving a contemplated trip to Arkansas in the ensuing winter, owing to the dangerous times. He was subject to sudden and severe bilious attacks and to pneumonia. He said nothing, however, as to any expectation of speedy death.

The witness Tulloss testified that he informed Mrs. Perkins of the deposit; that Mr. Perkins had told him soon after the deposit that he had deposited $13,000; he showed witness the key of the box, and said he was going to carry it home and give it to his wife, and that nobody could get the money but his wife. He was then in his usual health. He did not inform the witness why he had made the deposit.

W. O'Neil Perkins, a brother of Constantine Perkins, and a party to this litigation, was examined as a witness. His testimony was objected to as incompetent. He stated he met his brother in Nashville about two months before his death; his brother spoke of converting his currency into gold, saying he had no confidence whatever in United States Treasury notes, and to save what he had he would invest it in gold, which would be good at all times and under all circumstances. He asked witness to advise him where to keep his gold; that he was afraid to keep it at home as he might be robbed and his house burned at any time. The witness advised him to put the gold in a lock-box, put the key in his pocket, and deposit

the box in the vault of the Planter's Bank at Nashville. He replied that he would adopt the advice of the witness. His health was good. He said it was good, and said nothing about dying, or of his purpose to give the gold to any one; his sole object seemed to be to save his currency by converting it into gold. Some months after the death of his brother he had a conversation with complainant, in which she referred to the gold deposit, but set up no claim to it.

The witness Rowland testified that he lived with Constantine Perkins at the time of his death, and had lived with him since 1852; that he continued to live with the widow until 1868. He had a conversation with Constantine Perkins in the fall of 1864, when he returned from Nashville; he told him that he had purchased a large amount of gold, and assigned as a reason for buying it that he had no confidence in "greenbacks," and that he had deposited it in some bank in Nashville—the Planter's Bank, as witness thought—for safe keeping, and to pay his debts. Witness was very intimate with Mr. Perkins, and "conversant with his business;" he never said that the gold was put in the bank for any one except his own use.

Mr. Weaver, the cashier of the Planter's Bank, states that at the time of the deposit, or subsequent thereto, Mr. Perkins instructed him not to deliver the box to any one than himself or his wife, and in case of his death to deliver it to his wife only. His health was feeble, but not more so than usual.

The complainant gave a deposition in the case, which

was objected to so far as it disclosed conversations with her husband in his life-time in reference to the matters in issue, and the objection was sustained. She states, however, that in the summer of 1864, Mr. Perkins told her that he had deposited with Mr. Weaver, of the Planter's Bank, the sum of over twelve thousand dollars in gold in a tin box, and handed her the key of the box, telling her to take it and keep it, that he had told Mr. Weaver the deposit was made for her; and he told her she need not send for any of it, or write an order for any of it, but she must go herself and get it; that he had told Mr. Weaver to let no one have it but her. He delivered the key to her, and she had kept it ever since. After his death she took possession of the box, and upon opening it and counting the money she found it contained $5,258. She thought some of it had been abstracted. There was a crevice or crack in the bottom of the box which the teller said was caused by the weight of the gold. Mr. Perkins, on leaving home sometimes, entrusted his valuables to her keeping. She had advised him to put them in bank, as they would be safe there.

Upon the foregoing facts the Chancellor was of opinion that the gift was not established, and so decreed.

The complainant has appealed.

We have carefully collated the strong points of the testimony bearing upon the question, both that which is competent and that which is not, in order to give

the complainant the benefit of the whole case in ascertaining the intention of her late husband in this transaction. It is manifest that the case presents none of the elements of a gift *causa mortis*, for so far from the alleged donor being in that state of apprehension of impending death contemplated by law at the time of the act, he was actually at work about his business, and was actually contemplating a long journey out of the State. A *donatio causa mortis* is literally translated a gift in prospect of death. A gift made by a person in sickness who, apprehending his dissolution near, delivers, or causes to be delivered to another, the possession of any personal goods, to keep as his own in case of the donor's decease. 2 Bl. Comm., 514. It differs from a gift *inter vivos* because it is ambulatory and revocable during the donor's life, because it may be made to the wife of the donor, and because it is liable for his debts. It must be made in the conceived approach of death, otherwise it will not be a good *donatio causa mortis*. If made in the last sickness of the donor, or while languishing on his deathbed, it will be presumed to have been done in contemplation of death. *Miller* v. *Miller*, 3 P. Wms., 356; *Lawson* v. *Lawson*, 1 P. Wms., 441; *Walker* v. *Hodge*, 2 Swanst, 100; *Raymond* v. *Sellick*, 10 Conn., 480. A general apprehension of death from the mortality of man will not be sufficient, but it must be an apprehension arising from the peculiar sickness, peril, or danger. 4 Cold., 289. It is said that too much care cannot be taken in insisting on the most convinc-

ing evidence in cases of this kind; for these donations do amount to a revocation, *pro tanto*, of written wills, and not being subject to the forms prescribed for nuncupative wills, they are certainly of a dangerous nature.    Per Tilghman, C. J., in *Wells* v. *Spencer*, 3 Binney, 366.    In *Miller, et ux.*, v. *Jeffries, et al.*, it is well said that this kind of gift is of a mixed character, partly testamentary and partly donative, from an indulgence to the nature of the emergency; the law dispenses with the solemnity of a testament, and for that very reason requires the essentials of a gift.    4 Gratt, 472.

But this must be supported, if at all, as a gift *inter vivos*, or as a parol trust declared in favor of a wife, which, if it be clearly made out, and no injustice is likely to result to creditors, will be supported by a Court of Equity.    As to the manner of the gift, by delivering the key, it has been several times held that this would be a sufficient delivery, all other elements of a valid gift concurring.    And we can see no reason why the wife should not be the recipient of such a gift, and why it could not be sustained as well in her favor as in others, if creditors are not complaining.    But the question, in any event, resolves itself into one of intention.    In order to make this gift complete, it must appear absolutely and beyond a doubt that the donor intended to part with his dominion over the property.    If the intention to give or to declare the trust be not clearly made out, it cannot be supported; and if, upon the facts, the matter

be enveloped in doubt, that doubt must prevail against the hypothesis of a gift—and this is especially so where creditors are to be obstructed, embarrassed, or postponed in the collection of their debts. The testimony in this case is conflicting. A portion of it would seem to sustain the claim of the complainant, while there is much disinterested testimony which clearly negatives the idea of a gift. The testimony of the complainant herself, if accepted as competent, is not in accord with that of Weaver, and does not interpret the intention of Constantine Perkins as that of Weaver does. The latter states his instructions to have been not to deliver the box to any one except Constantine Perkins himself or wife, and in case of his death, to his wife only. It is manifest from these instructions that Constantine Perkins did not intend to relinquish his dominion over the box and its contents, but, on the contrary, he specially asserted it by the terms of said instructions; and the restriction thus imposed upon his bailee, that in the event of his death it was to be delivered to his wife—the trusted depository of his valuables in these disordered times—is altogether consistent with the purpose declared to the witness Roland, that this gold was deposited as his own, and for the payment of his debts. If there could be a doubt of this, it must yield to the pregnant fact that at the time of the deposit there was about $13,000 dollars in the box, and the strong presumption that Mr. Perkins himself reserved his own right of access to the box, had actually taken out a part of it to be in-

vested in loans or otherwise used by him—there being in the box at the time it came into the hands of the complainant only $5,268 of the $13,000 originally deposited. We cannot declare this a gift or a trust in behalf of complainant in view of the doubt and obscurity which envelopes the transaction, and it results that the decree of the Chancellor must be affirmed.