PAMELA MATHIS RAY, Administratrix, Appellant, v. LEADER FEDERAL SAVINGS & LOAN ASSO-CIATION, and LAVERA McCOY SMITH, Appellees. —292 S. W. (2d) 458.

Western Section. July 8, 1953.

Certiorari denied by Supreme Court, October 9, 1953.

626

Henry M. Crymes, Memphis, for appellant.

Pegram & Pegram, Ripley, Miss., for appellees.

AVERY, J. This suit originated by Bill of Interpleader of the Leader Federal Savings and Loan Association of Memphis, filed June 20, 1952 in the Chancery Court of Shelby County, Tennessee, against Pamela Mathis Ray, administratrix of the estate of J. T. Mathis, deceased, and Lavera McCoy Smith.

The above named administratrix, in such capacity, claimed the savings account of her decedent on investment deposit with the Interpleader, Leader Federal Savings and Loan Association of Memphis, as a part of his estate to be administered by her, and Lavera McCoy Smith claimed said account as a gift from said J. T. Mathis. These claims having been made to the Interpleader prior to the filing of the original bill.

Each defendant filed an answer setting out the specific reasons, together with explanations, why claim was made

to said account. Practically all the proof was by stipulations. Only one witness testified. He was the Secretary of the Interpleader. His testimony is in narrative form and only relates to the method of withdrawing and transferring investment accounts by the owner thereof on deposit with the Interpleader.

The stipulated facts appear in two separate stipulations, but are not very long. The alleged gift was made by an assignment written in the pass book evidencing the investment account and was transmitted by letter to the alleged donee. The letter is short. The purported assignment is short. The original of each of these two together with the envelope by which they were mailed showing the postage, the address and the return address were filed with the record in this Court, and we consider it proper that same be copied in this opinion. This is perhaps a first impression case, upon similar fact in either Mississippi or Tennessee, and many other states in the Union, in as far as the effect of suicide of the donor prior to physical delivery of the gift to the donee may affect the legality of the gift is concerned. And the facts should be very clearly set out so that the opinion will not be misunderstood in its application in the future.

The stipulated facts are as follows:

Filed October 2, 1952

R. Ps. 28-31

''As to certain facts of this case to be submitted to, and considered by, the Court on the trial of this cause on the merits, it is hereby stipulated and agreed by and between Pamela Mathis Ray, administratrix of the estate of J. T. Mathis, deceased and

Lavera McCoy Smith and their respective solicitors of record as follows:

"1. That J. T. Mathis, about 75 years of age, lived with his daughter, Pamela Mathis Ray, in DeSoto County, Mississippi, just South of the Tennessee line and on R. F. D. No. 9, out of the Post Office at Memphis, Tennessee. He was a widower, his wife, Mattie, having died some years prior to his death which occurred on July 17, 1951.

"2. That the said Lavera McCoy Smith on and before said date lived at Ripley, Tippah County, Mississippi; that prior to the moving of the said J. T. Mathis to DeSoto County about six years ago he had always lived in Tippah County, Mississippi, and in the Community where said Lavera McCoy Smith was reared and lived and that the relationship between the said Mathis and the said Mrs. Smith, she being his deceased wife's niece was always pleasant and cordial and agreeable.

"3. That the said Mathis up to the time of his death lived at the home of his daughter, the said Mrs. Ray and on the morning of July 17, 1951 the said Mrs. Ray and her husband left their home early to go to their work and from that time until the death of the said Mathis he was at home alone and that he deposited or caused to be deposited in the mail box of said home an envelope postage prepaid addressed to said Mrs. Smith at Ripley, Mississippi.

"4. That the said envelope so addressed contained the following:

"(a) A letter from the said Mathis in his hand writing to the said Mrs. Smith and a copy of that

letter is made an exhibit to her answer to the bill of Interpleader herein, (b) Seventy Dollars in United States currency and (c) the pass book of the Leader Federal Savings and Loan Association which is the pass book mentioned in the pleadings herein and said book and in the hand of the said Mathis and duly signed by him the benefits of the said pass book were assigned to the said Mrs. Smith.

"5. That the said mail route was serviced only once a day and on the said date the mail carrier serviced said box some time between 10:15 and 10:45 a. m. and in so going picked up the said letter and went on his way in completing his rounds on his route and depositing his mail in a post office in Memphis.

"6. That the said envelope was post marked at DeSoto Station in Memphis, Tennessee, at 7 o'clock p. m., on the 17th day of July, 1951; and in due and regular course of mail the said envelope with its contents were delivered to the said Mrs. Smith at approximately 9:30 a. m. on July 18, 1951 at Ripley, Mississippi.

"7. That at about 11:30 o'clock p. m. on July 17, 1951 after said carrier had picked up the mail from said box and gone on his way the said Mathis with the intention of committing suicide shot himself in the head with a pistol and the result thereof was that he never regained consciousness and shortly after 12 o'clock noon on that day he died.

"8. That the said Mathis died intestate leaving as his sole heirs and distributees at law three adult children, the said Pamela Ray, Willie Mathis, and

Mrs. Howard Wilbanks; and the said Mrs. Pamela Mathis Ray is now the duly and legally qualified administratrix of the estate of the said Mathis in the appropriate court in Shelby County, Tennessee.

"9. That on and prior to the 17th day of July 1951 there was in full force and effect a United States Postal Regulation with respect to 'Withdrawal and Recall of Mail and Withdrawal Before Dispatch' in these figures and words: 'After mail matter has been deposited in a post office it may be withdrawn only by the sender, or, in case of a minor, by the parent or guardian duly authorized to control the correspondence of the writer. Mail deposited by a person adjudicated of unsound mind may be withdrawn by the duly appointed guardian. Application for withdrawal shall be made on form 1509. When request is made for withdrawal of any mail, the applicant shall be required, if necessary, to exhibit a written address in the same hand writing as that upon the matter sought to be withdrawn, and such description of the matter or other evidence as will identify the same and satisfy the Post Master that the applicant is entitled to withdraw.

" 'When matter withdrawn from the mails before dispatch is again presented for mailing, the stamps originally affixed thereto shall be accepted in payment of postage.'

.."It is further agreed and stipulated that on the trial of this case on the merits either party may in addition to the above stipulated facts offer testimony with respect to any other material facts providing the offering of such testimony does not tend to contradict or set aside any stipulated fact above.

"Mrs. Lavera McCoy Smith

"By Pegram & Pegram

"Thomas E. Pegram

"Mrs. Pamela Mathis Ray, Administratrix by Henry M. Crymes, her solicitor of record."

Filed Dec. 11, 1952 R. page 34

"'The two defendants in the above styled cause, through and by their respective attorneys of record, and in addition to the facts set forth in a former stipulation on file, hereby mutually stipulate and agree that the following agreed facts may be taken as true by the Court on the trial of this cause, namely:

"1. That all during the year 1951 there was in effect and still is in effect the following postal regulation which is Section 52.44 of the Postal Laws and Regulations of 1948 and which reads: 'Return of Mail by Carriers forbidden. Mail which has come into the custody of rural carriers shall not be returned by him to any person. Any application for return of a letter or package shall be referred to the postmaster at the office of mailing.'

"2. The rural carrier servicing Route 9 out of Memphis leaves the Memphis, Tennessee post office at 9 a. m. daily and is scheduled to return to that office after servicing said route around 1:15 p. m. and these are the approximate hours of his departure from and return to the Memphis post office on July 17th, 1951.

"This the 3rd day of December, 1952.

"Mrs. Lavera McCoy Smith

"By Pegram & Pegram, Her Solicitors of record

"Mrs. Pamela Mathis Ray, Administratrix by Henry Crymes, Her Solicitor of record."

The original letter enclosed in the envelope is as follows:

### R. P. 32

"Hellow Laver this is my last note to you Lytle & Paunch has swaped plaices & gave me 2 weeks to get out. I have over $200.worth vegitables in garden they never said a word about them I have worked like a dog here trying to help out & that is the thanks I got Punch gives everything to Made. Willis dont wont me either or his wife dont & I have no other alternet & end it all & goe to Mattie All Lytle studdies is church Bob is in Hospittle Parelysed his Brother has to see after him Kids dont care I am inclosing $70.00 all the money I have on me at present Wont you to keep my Boddy til buried tell the folkes the truth that is my last wish

(Signed) uncle

over"

"I am enclosing savings account I have at Lader Federal Bank I have made it to you. Stay with the kids dont let them take it away from you am plaiceing everything I have the way I wont it."

The original envelope sent up with the letter has three 3 cent stamps on it and is addressed as follows:

"Mrs. O. D. Smith
Rout 5
Ripley Miss"

The return address on the envelope is as follows:

"Rout 9 Box 246
Memphis, Tenn."

The original pass book evidencing account No. 17561 is sent up with the record. It is made out to Mr. J. T. Mathis and on the inside of the first sheet in the account book just below the entry by the bank of the date and amount of the deposit evidenced by this pass book, is written in the same handwriting of the letter the following:

"this is to certify I have made this account over to Mrs. Lavera McCoy Smith for love and efection shown me this 17th day of July 1951

(Signed) J. T. Mathis"

The testimony by the Secretary of the Interpleader simply states that the regulations of the Association require that in event a depositor intended to withdraw funds on deposit he was required to sign a withdrawal order, pursuant to which the Association would issue its check to the payee named in the withdrawal order for the amount asked to be withdrawn.

The Chancellor has his findings in his decree and it sets out all the facts necessary to and does sustain the bill of Interpleader and all the facts necessary to show the jurisdiction properly in this Court, and, while he does not specifically state whether the gift is one inter vivos or causa mortis in that phraseology, the following statement is made:

"It further appears that said J. T. Mathis in his life time did transfer and give to said Lavera McCoy Smith said account and that she became and now is the absolute owner of all the rights and benefits of said account and that the said administratrix has no right or title therein"

His decree proceeds to direct payment to Mrs. Smith of the entire fund, which the record reveals the original investment to be $1,080 together with dividends accrued thereon of $9 June 30, 1951, $13.61 Dec. 31, 1951, and $13.77 June 30, 1952, making a total amount of $1,116.38. He provided for the payment of the cost out of the fund, and directed the Clerk to pay the remainder to Mrs. Smith.

An appeal was prayed by the aforesaid Administratrix Pamela Mathis Ray from the decree of the Chancellor and was perfected to this Court. There are only three assignments of error.

The First is that

"There is no material evidence to support the decree because: (1) The pass book was not delivered to the intended donee until after the death of the decedent, (2) After the decedent placed the envelope in the rural mail box and prior to his infliction of the mortal wound, he could have regained possession thereof; and (3) The intended gift was attempted in contemplation of suicide."

The second part of the above assignment can be disposed of very easily. While it is true that after the envelope containing the pass book and the letter to the donee were placed in the rural mail box and prior to the time that

it was picked up by the rural carrier, the donor could have personally and without permission of anyone, legally repossessed this mail, he did not do so. The record reveals nothing that had rendered the donor incapable of taking the letter from the mail box until after the carrier had picked it up and gone on his way. The stipulations expressly provide that:

"after said carrier had picked up the mail from said box and gone on his way said Mathis with the intention of committing suicide shot himself in the head with a pistol and result thereof was that he never regained consciousness and shortly after 12 o'clock noon on that date he died."

No presumption can be drawn from the fact that his failure to take the letter out of the mail box before the carrier picked it up, indicates that the donor did not intend to make a gift to the donee, either inter vivos or causa mortis. To the contrary it can be well inferred that the donor knew about the time the letter would be picked up by the rural carrier, having lived there for 6 years, and that his failure to repossess this mail while he could have done so without permission of any one, strongly indicates that he was determined to place that particular item by mail beyond his control and thus make a valid gift. His action in this regard is as deliberate as if he had stood at the mail box until the carrier came along and physically handed the letter containing the pass book to the carrier.

The first part of the above assignment presents a more serious question. The actual physical delivery to and possession of the pass book was not accomplished by the donee until some 22 hours after the death of the decedent.

The correct answer to this assignment of error wilfully determines the second assignment of error which is:

"The Court erred in holding that delivery of the pass book to the intended donee had been effected by allowing the mail carrier to remove the letter from the mail box, despite the fact that it was not delivered to the intended donee until about 22 hours after his death."

The deliberation evidenced by the action of the donor, as revealed by this record indicates that the donor thought he had done everything possible under the circumstances to make a delivery of what he designated a gift to Lavera McCoy Smith of his account evidencing the investment deposit made by him in the Leader Federal Savings and Loan Association, together with his written transfer thereof to her which he thought sufficient to make her the owner of the account so invested. He evidently thought he was making the mail carrier an agent of the donee. It is certain from this record that the donor could not make an actual manual or personal delivery of the pass book, containing his written assignment to the donee at any time prior to his death. Distance from home of donor to home of donee and time between putting the letter in the mail box and death of the donor, both prevent such act. The account could not have been closed and the money delivered during that time and the account book or pass book was his only title instrument showing that the account belonged to him, so far as this record reveals, and we have no right to assume otherwise. It had a printed form on the inside of the back cover which was placed therein for the purpose of showing that the account could be transferred and which form could have been used by him had he so chosen.

Whether he actually knew it was there or not, this pass book contained and was his contract with the Association, subject to its by laws and the record discloses nothing which could have prevented him from writing his own transfer assigning that account to some other person.

Immediately below the purported long hand written transfer by the donor there is printed in said pass book, in bold letters this statement:

"To make withdrawals account book must be presented"

The donor could not have failed to see and understand the meaning of that statement and he made it possible for the donee to personally and physically comply with that instruction, and impossible for him to do so.

■ Symbolical or constructive delivery of a gift may be made and thereby complete the delivery factor as legally as if actual physical delivery had occurred. The general rule is stated in 24 Am. Jur. 744-5, and is as follows:

"As a general rule, where an actual manual delivery of property cannot be made, the donor may do, that which, under the circumstances, will in reason be considered equivalent to an actual delivery. In such cases the delivery may be symbolical or constructive, although in all cases it must be as nearly perfect and complete as the nature of the property and the attendant circumstances and conditions will permit. Thus, in some cases, an unequivocal declaration of gift accompanied by a delivery of the only means by which possession of the article given can be obtained, is held to be sufficient, and the general rule prevails where the article intended to

be given is incapable of manual delivery,—that a symbolical delivery of a fund may be made by delivery of the instrument making an appropriation of the fund.''

Perhaps the finest discussion of the question of the methods of accomplishing legal delivery of a gift by the courts of Tennessee is found in the case of Scott v. Union & Planters Bank, decided by our Supreme Court, 123 Tenn. 258-297, 130 S. W. 757. That case originated in Lauderdale County, Tennessee. It is a very full discussion, long and learned and we only quote a few statements from it. The case involved the gift of a certificate of deposit in a commercial bank amounting to over $125,000 and United States Bonds amounting to over $50,000. In that case our court reviewed and quoted with approval many statements from other courts of final resort in arriving at what we might refer to as the modern methods of legal delivery recognized by the courts. As to a gift inter vivos there is quoted with approval the case of Weaver v. Weaver, 182 Ill. 287, 55 N. E. 338, 339, and is as follows:

''The usual mode of delivery is the mutual transfer from the grantor to the grantee. But it is too well understood to call for the citation of authorities that the declarations and conduct of the grantor in relation to the instrument may be such as to become equivalent to such actual delivery, and in every such case the crucial test is the intent with which the acts or declarations were made, and that intent is to be ascertained from the conduct of the parties, particularly the grantor, and all the surrounding circumstances of the transaction.''

Also quoted with approval in connection with such gifts is Weber v. Christen, 121 Ill. 91, N. E. 893. There it is said:

" 'Delivery is by words, acts, or both combined, by which a grantor expresses a present intention to divest himself to title to property described in a proper deed. No particular form of delivery is required. A deed may be manually given by the grantor to the grantee, yet manual delivery is unnecessary. The real test of delivery is: Did the grantor, by his acts or words, or both, intend to divest himself of title? If so, the deed is delivered.' "

The case of Scott v. Union & Planters Bank, supra, is quoted with approval in Collins v. McCanless, 179 Tenn. 656, 169 S. W. (2d) 850, 145 A. L. R. 1380.

As to a gift causa mortis, in the case of Scott v. Union & Planters Bank, supra, there is quoted with approval, relative to gifts causa mortis, many expressions of courts of final resort in other states, and particularly interesting is our case of Royston v. McCulley, Tenn. Ch. App. 59 S. W. 725, decided by the Court of Chancery Appeal and decree of that Court affirmed by our Supreme Court. After discussing that case our Supreme Court said [123 Tenn. 258, 130 S. W. 764]:

"An examination of the modern cases all show, while courts will scrutinize with care the evidence upon which gifts causa mortis are sought to be sustained, and will require in every case clear and convincing proof, yet, when it is once ascertained that it is the intention of the donor to make such a gift and all is done which is possible under the

circumstances in the matter of delivery, the gift will be sustained.''

Turning again to the instant case, when Mathis delivered to the rural mail carrier his pass book, with the attempted transfer of his savings account written therein, transferring it to Mrs. Smith, placing the pass book in her possession so she could present it to the Association, he placed it beyond his voluntary and personal right and authority to recall it. Therefore the rural carrier could not be his sole agent, for the principal has right, in ordinary circumstances, to control his agent. The carrier had but one duty to perform and that was to carry that letter toward the destination to which it was addressed, which duty of that carrier ended in the Post Office in Memphis, Tennessee about 1:15 p. m. that day.

The duty of the Post Master or those attendants and employees in the Post Office was to dispatch that letter promptly, which they did and it left that Post Office continuing toward its destination, according to the Post-mark, at or soon after 7 o'clock p. m. that evening, no effort being made by any one to obtain it. Had Mathis lived, the record discloses the fact that for him to have ever recalled that letter he would have had to obtain the permission of some postal official,—the Post Master in the dispatching office. That put the delivery of the alleged gift beyond the personal control of Mathis and, beyond his personal right of recall, and nothing else occurring would complete a gift.

When a letter is mailed with sufficient postage to carry it to its destination properly addressed and admittedly received, with no effort made to recall it, it is in

legal effect delivered to the addressee. This is the position of the Appellee citing several cases holding that:

> "It is settled law, that when a letter is mailed, it is in legal effect, delivered to the addressee, particularly where the fact that it was received is not denied by the letter." Shriver v. Union Stock Yards Nat'l Bank, 117 Kan. 638, 232 P. 1062; Ennis-Baynard Pet. Co. v. Plainville Mill & Elevator Co., 118 Kan. 202, 235 P. 119; Brandon v. Dawson, 51 Mo. App. 237; American Surety Co. of New York v. Balke, 54 Idaho 1, 27 P. (2d) 972, 91 A. L. R. 153, et seq."

We think that rule applies in this case, and that when this letter, under the circumstances shown by the record, was permitted to be taken from the mail box by the rural carrier, received in the dispatching office, no effort made to recover it and admittedly delivered, that it was in legal effect delivered.

We are also of the opinion that the account, shown by the pass book could be legally transferred to a 3rd party by a transfer such as is attempted here. The Association is not a regular commercial bank. The account is not a checking or open account. It is an investment account, properly so referred to in the pleadings, evidenced by the pass book showing the deposit and has more the nature of a time deposit in a commercial bank than that of an open account. The assignee of this account claimed it. While the Interpleader was correct in filing its bill and paying the money into court, we think the Association might have legally transferred that account upon its book, not in order to perfect a gift to Mrs. Smith, but for the clarification of its own records, if

suicide of donor did not vitiate or void the whole transaction.

This brings us to the final question raised by the Appellant to the effect that suicide of the donor vitiated and made void the attempted transfer of the account.

The third assignment of error is as follows:

"The Court erred in holding that the intended gift was not invalidated by reason of the fact that the attempt was made by the decedent in contemplation of suicide."

In the case of Dietzen v. American Trust & Banking Co., 175 Tenn. 49, 131 S. W. (2d) 69, 71, after referring with approval to the case of Scott v. Union & Planters Bank, supra, many other cases of different courts and texts on the subject, our Supreme Court said:

"A donatio causa mortis differs from a gift inter vivos because it is ambulatory and revocable during the donor's life. Sheegog v. Perkins, 63 Tenn. 273. It must be made in the concerned approach of death; not a general apprehension of death from the mortality of man, but an apprehension arising from the peculiar sickness, peril or danger. Gass v. Simpson, 44 Tenn. 288. 'If made in the last sickness of the donor, or while languishing on his death bed, it will be presumed to have been done in contemplation of death'. Sheegog v. Perkins, supra. In such case, says Mr. Pomeroy in his work on Equity Jurisprudence, vol. 3, p. 2654, 'it will be presumed to be a donation causa mortis, although the donor does not, in express terms, declare it to be such'. In the instant cause, the donor, stricken with a serious

illness, while lying on what proved to be her death-bed, though showing some improvement at the time, made the gift to her physically disabled son about whose financial condition she was concerned. Under the circumstances shown, it may be inferred that the gift was made in contemplation of impending death."

The gifts in that case were Cash of $500, two U. S. Savings Bonds face value $1,500, and certain U. S. Postal Savings Certificates with face value of $2,500. The Chancellor granted decree for the full amount of both. The Court of Appeals reversed that part of the decree relating to the Postal Savings Certificates because of no written assignment and the Supreme Court reversed the Court of Appeals and affirmed the Chancery Decree.

■ ■ Particular attention is given to the general definition of a gift causa mortis as one,

"made in the conceived approach of death, not general apprehension of death but an apprehension arising from a peculiar sickness, peril or danger."

Does death by contemplated suicide by a person who is presumed to be physically and mentally well, as in the instant case, arise from an apprehension due to a peculiar sickness, peril or danger? Black's Law Dictionary, Second Edition at page 1121 defines suicide as follows:

"Suicide is the wilfull and voluntary act of a person who understands the physical nature of the act, and intends by it to accomplish the result of self termination. Suicide is the deliberate termination of one's existence, while in the possession and enjoyment of his mental faculties. Self killing by an insane person is not suicide."

There is nothing in the record to indicate that Mathis was not fully possessed of his mental faculties. His action in destroying himself was deliberate, just as deliberate as was his gift to Mrs. Smith. Perhaps he had mentally determined to make the gift to her before he had determined to kill himself, but regardless of which determination first appeared to him, there was no apprehension of death appearing from sickness, peril, or danger, unless his determination to shoot himself can be classed as a peril or danger, and we do not think that, under the facts and circumstances of this case it can. Sickness, peril and danger, as used in definitions of donations causa mortis we believe to mean something other than a determination of an individual who is presumed to be well, physically and mentally, to take his life.

The case of Pikeville National Bank & Trust Co. v. Shirley, 281 Ky. 150, 135 S. W. (2d) 426, 429, 126 A. L. R. 919, a Kentucky case is relied upon by Appellant for authority to determine that a gift made in contemplation of suicide is against public policy and void. There were three items in that case. The Court held some of them to be legal gifts and others not legal. The one held to be illegal was an effort by one Gray to authorize a commercial bank to transfer a savings account making out a new pass book in the name of his Sister. The effort was by mail, and on a page in his pass book was written:

" 'Peoples National Bank.

" 'Please make out new book in name of Clara G. Shirley of Greenwood, Virginia; with the above $5000.00 with accrued interest in lieu of above, and mail to her.

E. E. Gray' "

It is observed from the above attempted gift transfer that Gray created the Bank as his agent to make out a new book in name of his sister, and death having occurred before his agent's instructions had been received, even though carried out before knowledge of donor's death, which revoked such agent's authority, presented a different question from that now presented in the instant case.

In the case of Pikeville Nat. Bank & Trust Co. v. Shirley, supra, the Court said:

"Normal men are the arbitors of their own fate so far as suicide is concerned, since that is a matter within their own power of control. But not so with disease or dangers and risk to which they may be exposed by surgical operations or like perils. We find no authority to indicate that apprehension of death by contemplated suicide is such eminent peril as would hold a gift causa mortis."

In that case the court simply held that suicide was not death by disease, peril or danger, and that a necessary factor in a gift causa mortis was lacking, for the reason that contemplated suicide could be voluntarily abandoned, and that "a gift so made [was] against public policy."

Finally there is offered in support of the position that such a gift as attempted by Mathis in the instant case would be void as against public policy in Mississippi because of the penal provisions of Section 2375 of the Mississippi Code 1942, making it a felony for any person,

"Who wilfully or in any manner, advises, encourages, abets, or assists another person to take, or in taking, the latter's life, or in attempting to take the latter's life, is guilty of felony."

 This is certainly a very sensible criminal statute and public policy would most certainly condemn any one who was guilty of such offense to the extent as would deprive such offender from taking a gift by the person so advised, encouraged, abetted or assisted, whether the effort was successful or not, but the statute should not penalize an innocent person so as to deprive him of a gift if the gift were otherwise legally consummated.

We have no fault with the Mississippi cases cited in Appellant's brief. No doubt the brief is as well prepared as possible and Appellant has certainly been ably represented by her excellent counsel, but a study of the cases convinces this Court that none of them can be relied upon as authority for this Court to overthrow the opinion of the Chancellor. We think the record in this case shows that J. T. Mathis intended to make a gift inter vivos regardless of the fact that he soon thereafter committed suicide; that he did all that was reasonable during his life to carry out his intention, and that he legally did so.

 The result therefore is that all exceptions of Appelant are overruled and a decree will be rendered here as in the Court below, with cost accruing on the appeal in this court against the Appellant, but without interest. No interest is allowed because we believe this to be different from the money judgment cases in which we are required to allow interest, but in such case as the Court may exercise its discretion as to interest.

Swepston, P. J. (Western Section), and Carney, J., concur.