JOHN L. GREER AND ESTATE OF RUSSELL Z. GREER, DECEASED, JOHN L. GREER, EXECUTOR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6912–76.     Filed May 22, 1978.

*Richard D. Hall, Jr.*, for the petitioners.
*Wesley J. Lynes*, for the respondent.

STERRETT, *Judge:* Respondent determined a deficiency in petitioners' Federal income taxes for the calendar years 1970, 1971, and 1972 as follows:

| Year | Deficiency |
|------|-----------|
| 1970 | $2,977.68 |
| 1971 | 58,654.92 |
| 1972 | 28,691.62 |
|      | 90,324.22 |

After concessions by the parties the following issues remain for our determination: (1) Whether petitioners' use of the corporate aircraft during these years resulted in taxable income to them calculated at the hourly rental value or was excludable from gross income under section 105(b), I.R.C. 1954; (2) whether John L. Greer, for purposes of section 1251(e)(4), was engaged in the trade or business of farming during these years; (3) whether the allowable charitable deductions need to be adjusted; (4) whether petitioners made a completed gift of several J. Gould bird prints on December 22, 1972; (5) whether Greer's payment of rent in 1970 was a section 213 medical expense.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The

stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner John L. Greer (hereinafter Greer) is an individual and, as executor of the Estate of Russell Z. Greer, is a fiduciary who resided in Knoxville, Tenn., at the time of filing the petition herein. Russell Z. Greer was the wife of John L. Greer during the taxable years 1970, 1971, and 1972. John L. Greer and Russell Z. Greer filed their original joint Federal income tax return for their taxable year 1970, their amended return for that year, and their joint returns for their taxable years 1971 and 1972 with the Internal Revenue Service Center, Memphis, Tenn.

At the onset of the taxable years in issue Greer was either a director or an officer in each of the following corporations: Brown & Greer Co., Inc., of which he owned 28 percent of the outstanding stock; Kern's Bakeries, Inc., of which he owned 28 percent of the outstanding stock; Kern's Bakery of London, Kentucky, Inc.; Agricultural Processors Cooperative Corp.; and Kern's Bakery of Virginia, Inc., of which he, together with his immediate family, owned a collective 50 percent of the outstanding stock. By June of 1972 Greer was neither an officer nor a director in any of these companies except for Kern's Bakery of Virginia, Inc.

During the taxable years in issue Kern's Bakery of Virginia, Inc., owned an aircraft normally used for corporate business. The hourly rental value of such aircraft during the taxable years 1970, 1971, and 1972 was $133.70, $145.49, and $139.50, respectively.

During 1970 Greer used this aircraft 38.925 hours which use respondent has determined was for other than normal corporate business. Respondent has determined that 9.3 hours were for the purpose of conducting Greer's business and 29.625 hours were for the purpose of transporting Russell Z. Greer for medical care. Based upon the above determination, respondent included $5,204.27 in Greer's income for the year 1970 and allowed him a business deduction of $1,243.41 and a medical expense of $3,960.86.

During 1971 Greer used this aircraft 40.4 hours which use respondent has determined was for other than normal corporate business. Respondent has determined that 11.6 hours were for the purpose of conducting Greer's business and 22.4 hours were for the purpose of transporting Russell Z. Greer for medical

care. Based upon the above determination, respondent included $5,877.80 in petitioners' income for the year 1970 and allowed Greer a business deduction of $1,687.68 and a medical expense of $3,258.98. Because of the percentage limitation, the medical expense is not allowable.

During 1972, Greer used this aircraft 45 hours which use respondent determined was for other than normal corporate business. Respondent further determined that all 45 hours were for the purpose of transporting Russell Z. Greer for medical care and has included $6,277.50 in petitioners' income and allowed no deduction since medical expenses did not exceed the percentage limitation.

Since the late 1950's, in addition to his other business interests, Greer has engaged in the business of racing horses. Between May 18, 1957, and December 1, 1975, Greer acquired 54 race horses. Of the 54 horses, 38 were purchased from outside sources and 16 were born of brood mares owned by him. As of December 1, 1975, Greer retained 21 of the 54 horses. The following schedule reflects Greer's ownership of race horses to December 1, 1975:

| Females | Acquired | Method of acquisition[1] | First used as brood mare[2] | Disposition |
|---------|----------|--------------------------|----------------------------|-------------|
| Russ Elaine | 5/18/57 | P | ? | sold 1/2/71 |
| Lay By | 8/4/64 | P | ? | sold 10/15/70 |
| Penn Miss | 3/7/66 | P | ? | sold 10/13/70 |
| Ridell | 3/24/66 | R | ? | sold 10/14/70 |
| Cathy Capers | 2/25/68 | R | ? | died 1975 |
| Talahi | 3/20/69 | R | 1972 | retained |
| Delso | 4/13/69 | P | 1974 | sold 10/6/75 |
| Ridan-Lay By | 4/13/69 | R | NA | killed 1970 |
| Rucala | 7/21/69 | P | NA | claimed 2/27/71 |
| Maihi | 10/31/69 | P | 1972 | retained |
| Miss Pennruss | 2/14/70 | R | NA | sold 1972 |
| Northern Holiday | 3/17/70 | P | 1972 | retained |
| Narso | 10/12/70 | P | 1975 | retained |
| Quillomiss | 10/13/70 | P | ? | sold 1974 |
| Low Heels | 3/12/73 | P | NA | retained |
| Stardonic | 4/13/73 | P | NA | retained |
| My Sweet Song | 10/9/73 | P | NA | sold 1974 |
| Quillomiss filly | 3/20/74 | R | NA | retained |
| Narso | 5/3/74 | R | NA | retained |
| Flying Holiday | 5/29/74 | P | NA | retained |
| Bay filly | 4/10/75 | R | NA | retained |
| Nurses Child | 4/25/75 | R | NA | sold 1974 |
| Miss Page | 10/18/75 | P | NA | retained |

| Males | Acquired | Method of acquisition | Disposition |
|---|---|---|---|
| Mr. Brogann | 4/26/65 | R | retained |
| Knox County | 3/19/68 | P* | donated 1970 |
| Figlio | 7/22/68 | P | broken down 1970 |
| Parity | 7/23/68 | P | donated 1971 |
| Nominee | 7/23/68 | P | donated |
| Full Swing | 9/10/68 | P | claimed 10/10/70 |
| One Wise Man | 8/14/69 | P | claimed 6/10/70 |
| Bluff Drive | 9/9/69 | P | sold 12/6/71 |
| Pago Penn | 9/13/69 | R | claimed 11/29/71 |
| Paige | 2/23/70 | R | claimed 6/8/73 |
| Danby | 4/22/70 | R | gave away 1973 |
| King Rocky | 10/13/70 | P* | sold 1972 |
| Mr. Behaving | 4/13/71 | P* | sold 11/21/72 |
| Bold Clash | 10/7/71 | P | sold 1972 |
| Cades Cove | 10/7/71 | P | claimed 1/26/73 |
| Delmore | 10/7/71 | P* | sold 1974 |
| Ridanhi | 2/7/73 | R | retained |
| Crozier's Best | 2/26/73 | R | retained |
| Leadership | 3/27/73 | P* | claimed |
| Foolish Pleasure | 8/7/73 | P | retained |
| Fast Hilarious (1/2) | 2/16/74 | P* | retained |
| Tropical Breeze | 3/16/74 | P* | retained |
| Narso Colt | 4/30/75 | R | retained |
| Golden Gossip | 9/8/75 | P* | retained |

| Studs | Amount of ownership | Acquired | Method of Acquisition | Disposition |
|---|---|---|---|---|
| Ridian | 9/30 | 5/12/60 | P | sold 11/16/72 |
| Pago Pago | 5% | 7/1/63 | P | retained |
| Run For Nurse | 1 share | 1/2/64 | P | retained |
| Landing | 1 share | 12/16/65 | P | sold 12/26/71 |
| Young Emperor | 1 share | 12/16/65 | P | sold 12/1/73 |
| Mr. Leader | 1 share | 12/31/70 | P | retained |
| Full Pockets (purchasing for racing) | 1 share | 8/1/74 | P | retained |

¹ P — purchased; R — reared; P* — purchased on foaling date.
² ? — unknown; NA— not applicable.

During the year 1970, Greer donated to the University of Tennessee a race horse named Knox County which had a fair market value on the date of the gift of $9,500. This horse had cost Greer $2,500 on March 19, 1968. It had been depreciated $875.03 in those years prior to 1970 and $500 in 1970 for a total depreciation of $1,375.03 and an adjusted basis of $1,124.97. Greer claimed a charitable deduction of $9,500. Respondent adjusted the claimed deduction to take into account sections 170(e)(1)(A) and 1245, as follows:

| | |
|---|---|
| Fair market value | $9,500.00 |
| Less: Adjusted basis | 1,124.97 |
| Sec. 170(e)(1)(A) gain | 8,375.03 |
| Less: Sec. 1245 adjustment for 1970 depreciation | 500.00 |
| Increase in taxable income | 7,875.03 |

During the year 1971 Greer donated to the 4–H Club of Blount County, Tenn., a race horse named "Parity" which had a fair market value on the date of the gift of $32,333. This horse had cost Greer $4,400 on July 23, 1968. It had been depreciated $1,583.35 in years prior to 1970 and $2,016.67 in the years 1970 and 1971 for a total depreciation of $3,600.02 and an adjusted basis of $799.98. Greer claimed a charitable contribution of $30,316.33 by subtracting recapture of $2,016.67 from the fair market value. Respondent adjusted the claimed deduction to take into account sections 170(e)(1)(A) and 1245, as follows:

| | |
|---|---|
| Fair market value | $32,333.00 |
| Less: Adjusted basis | 799.98 |
| Sec. 170(e)(1)(A) gain | 31,533.02 |
| Less: Sec. 1245 adjustment for 1970 and 1971 depreciation | 2,016.67 |
| Increase in taxable income | 29,516.35 |

In December of 1972 Greer called at the office of Dr. Alfred K. Guthe (hereinafter Guthe), Director of the Frank H. McClung Museum at the University of Tennessee, to express his desire to donate several J. Gould bird prints to the university. These prints had been appraised by Annette Drumm. Guthe went to Greer's home in his official capacity on December 22, 1972, to view the prints. At this time Greer offered the prints to the university and Guthe accepted them on its behalf. The prints were close to 100 years old. December 22 was a Friday preceding a long Christmas weekend and Guthe had stopped at Greer's house on his way home. Greer offered the services of an employee who would deliver the prints to the university the following week. To avoid the extra handling of the prints that would result from Guthe's taking the prints with him at the time, he accepted Greer's offer. The records of the University of Tennessee indicate that the prints became an asset of the university on December 27, 1972.

Greer left for Florida on December 25, 1972, expecting that the prints would be delivered immediately after Christmas. His employee made two or three trips to the university during the week of the 25th attempting to deliver the prints each time. On each occasion he found the university closed for vacation. The prints were finally delivered in January prior to Greer's return. At the time of his return Greer discovered that the delivery had been delayed.

For the taxable year 1972 petitioners claimed charitable deductions of $74,178.12, of which $28,708 represented the J. Gould bird prints which Greer had contributed to the University of Tennessee. The parties agree that the fair market value of the prints on the date of the gift was $28,708. Respondent found that the prints were contributed to the university in 1973.

Russell Z. Greer was advised by Dr. E. Charles Sienknecht, a medical doctor who specialized in internal medicine, to spend her winters in Florida for health reasons. Russell Greer was being treated for asthma, bronchitis, and a chronic respiratory infection. She was also being given drug therapy for an ovarian carcinoma. The combination of the drug therapy and respiratory problems compromised her resistance to infection.

Greer rented an apartment in Florida during the winter months of 1970. Expenses incurred for rent and utilities were $7,234.87. That amount was paid in 1970. Greer included this amount in computing his medical deduction for his taxable year 1970. Respondent disallowed this inclusion.

## OPINION

### Issue 1. Use of Aircraft

During 1970, 1971, and 1972 petitioners used an aircraft owned by Kern's Bakery of Virginia, Inc., to transport Russell Z. Greer for medical care. Greer contends that the aforesaid usage was furnished by his employer in accordance with the terms of the employer's medical insurance program and therefore gives rise to neither income nor deductions. Respondent found that petitioners had used corporate property without reimbursing the corporation for such use, resulting in income to them calculated at the hourly rental value for such property.

Amounts expended on behalf of a taxpayer by reason of

health insurance furnished by an employer are excluded from gross income. Sec. 105(b).[4] Section 105(e)[5] provides that, for purposes of section 105, amounts received pursuant to an employer's health plan shall be treated as health insurance. Section 1.105–5(a), Income Tax Regs., interprets that section, in part, as follows:

> (a) *In general.* Sections 104(a)(3) and 105(b), (c), and (d) exclude from gross income certain amounts received through accident or health insurance. Section 105(e) provides that for purposes of sections 104 and 105 amounts received through an accident or health plan for employees * * * shall be treated as amounts received through accident or health insurance. * * * it is not necessary that the plan be in writing or that the employee's rights to benefits under the plan be enforceable. However, if the employee's rights are not enforceable, an amount will be deemed to be received under a plan only if, on the date the employee became sick or injured, the employee was covered by a plan (or a program, policy, or custom having the effect of a plan) providing for the payment of amounts to the employee in the event of personal injuries or sickness, and notice or knowledge of such plan was reasonably available to the employee. * * *

Greer presented testimony to the effect that such a plan covering the employees of Kern's Bakery of Virginia, Inc., was in existence during the relevant years. Greer did not produce a copy of the plan. Information concerning the plan was summarized in an employee's handbook and on an employee's card.[6] We

---

[4]SEC. 105(b) AMOUNTS EXPENDED FOR MEDICAL CARE.— * * * gross income does not include amounts * * * paid, directly or indirectly, to the taxpayer to reimburse the taxpayer for expenses incurred by him for medical care * * * of the taxpayer, his spouse, and his dependents * * *

[5]SEC. 105(e) ACCIDENT AND HEALTH PLANS.—For purposes of this section and section 104—
(1) amounts received under an accident or health plan for employees * * *

*    *    *    *    *    *    *

shall be treated as amounts received through accident or health insurance.

[6]The sample card submitted by Greer summarized the plan as follows:

[Front of card.]

KERN'S EMPLOYEES' GROUP HEALTH INSURANCE

| Coverage | Employee | Family |
|---|---|---|
| Surgery | 80% of Bill | 80% of Bill |
| Hospital | 80% of Bill | 80% of Bill (Non Medical Charges Not Covered) |
| Anesthetic | 80% of Bill | 80% of Bill |
| Maternity | 80% of All Charges | 80% of All Charges |
| | Maternity claim not covered until insurance in force 9 months and one day | |
| Sick Pay | $50.00/week (Starting 4th Day) Accident off job—Starting 1st Day | |

[Back of card.]

| | | |
|---|---|---|
| Nursing | $50 Deductible, Then 80% | $50 Deductible, Then 80% |
| Medicine | $50 Deductible, Then 80% | $50 Deductible, Then 80% |
| Therapy | $50 Deductible, Then 80% | $50 Deductible, Then 80% |

are persuaded that a health plan was in existence during the relevant period. However, without reviewing a copy of the plan, or even having before us unequivocal testimony with respect to the plan's coverage of transportation costs, we cannot find that a written plan existed which encompassed use of the corporate aircraft to transport covered persons.

However, Greer contends that employees had notice or knowledge of the availability of the corporate aircraft for transporting those in need of medical care, thereby qualifying the plan within the purview of section 1.105-5(a), Income Tax Regs. In support of this contention, testimony was presented that the aircraft had, in fact, been used during the relevant period[7] to transport two other covered persons: Thurman Crabtree, a maintenance supervisor, and Jerry Moore, an area supervisor. Therefore, a "policy or custom" existed which had effect of a plan. We accept this last contention of petitioner and find that the employees had notice that the aircraft was available for such use, and that the plan was therefore a valid section 105 plan.

Respondent argues that a disparity of treatment existed between the use of the aircraft by petitioners and by other employees based on the number of hours logged in transporting such persons. However, the record contains uncontroverted evidence that requests to use the corporate aircraft for medical purposes were never denied. Neither were the employees credited with taxable income or charged for the use of the aircraft. For these reasons we do not find the number of hours logged to be material.

We find that amounts expended by the corporation on behalf of Russell Z. Greer for the purpose of transporting her in the

---

| Braces, Crutches, etc. | $50 Deductible, Then 80% | $50 Deductible, Then 80% |
| Doctor Visits (Non Surgery) | $50 Deductible, Then 80% | $50 Deductible, Then 80% |

All of the above may be counted together toward the $50 Deductible per claim.
Each illness is considered a separate claim.

[7]Respondent, on brief, argues that these flights took place after petitioners' use of the aircraft was put in issue. Although the record discloses that another employee, Joyce Nabors, used the aircraft within a year of the trial date, as did Mrs. Bruce Booker, the wife of a truck driver, respondent blocked introduction of evidence that could have established the dates on which Crabtree and Moore were transported. Therefore, respondent's reliance on Estate of Leidy v. Commissioner, T.C. Memo. 1975–340 (a Memorandum Opinion of this Court affd. per curiam 549 F.2d 798, 39 AFTR 2d 77–877, 77–1 USTC par. 9144 (4th Cir. 1976)), is unfounded.

corporate airplane are excluded from petitioners' gross income by section 105.

## Issue 2. Raising of Horses

Respondent has determined that, for purposes of the application of section 1251,[8] Greer was engaged in the trade or business of farming during the taxable years 1970, 1971, and 1972. He bases that determination on the section 1251(e)(4) definition of trade or business of farming and the interpretation that sec. 1.1251–3(e)(2), Income Tax Regs., adopts with respect to that definition.[9] Because Greer did not purchase all of his horses at racing age respondent considers Greer to be "engaged in the raising of horses." Greer argues that respondent's interpretation of paragraph 1251(e)(4) is improperly expansive.

Section 1251(e)(4)(A) provides that for those engaged in the raising of horses "the term 'trade or business of farming' includes the racing of horses." It is a given that Greer was engaged in the racing of horses. The American Heritage Dictionary (1976) defines the term "raise," for our purposes, as "To grow or breed. To bring up; rear."

Section 1251 was enacted to prevent tax deferral based on accounting rules for farmers when the farmers, in addition to their farm income, have substantial amounts of nonfarm income. The perceived tax abuse resulted from the combination of the correct deduction of expenses allowed for farmers which otherwise are capital in nature with the capital gains treatment on the sale of livestock bred by the taxpayer. See 91 Cong. Rec. 7976 (1969).

During the years in issue Greer's brood mares dropped three foals. Of the 36 horses he held during this period 6 were studs in which he owned a partial interest and the remaining 30 were held for racing purposes. Greer had purchased the 6 studs, but he

---

[8]We note that for taxable years beginning after Dec. 31, 1975, farm net losses are no longer added to the excess deduction account. Sec. 1251(b)(2)(D). In its place Congress enacted sec. 447, relating to methods of accounting for corporations and partnerships engaged in farming; sec. 464, relating to deduction limitations for farming syndicates; and sec. 465, relating to amounts "at risk." H. Rept. 94–658 (1975), 1976–3 C.B. 784.

[9]Sec. 1.1251–3(e)(2). *Horse racing.* If a taxpayer is engaged in the raising of horses, including horses which are bred or purchased, then for purposes of section 1251 the term "trade or business of farming" also includes the racing of such horses by the taxpayer. Thus, for example, if a taxpayer purchases a yearling and develops it to the racing stage, the term "trade or business of farming" includes the racing of such horse.

raised 9 of the remaining 30 horses from foal. At least to the extent that Greer bred horses and raised them from foal he was engaged in the raising of horses during the years in issue even though not primarily so engaged. It is obvious to us that he raised his horses for racing purposes. We do not ascribe a tax avoidance intent to the manner in which Greer conducted his horseracing business. However, to the extent that Greer was involved in breeding horses his operation could take advantage of what Congress deemed a tax "loophole" that allowed current deduction of capital expenses. See Hearing Before the Senate Comm. on Finance, 91st Cong., 1st Sess. 3530 (1969).

Section 1251 was aimed at the "taxpayers who carry on limited farming activities as a sideline to obtain a tax loss (but not an economic loss) which is then deducted from their high-bracket, nonfarm income." S. Rept. 91–552 (1969), 1969–3 C.B. (Vol. 2) 423, 485. Although petitioners have high-bracket nonfarm income their horse racing activities are substantial and, for the years in question, resulted in an actual economic loss. The expenses of horseracing which resulted in deductions for the relevant tax years were not capital in nature. Cf. *Gamble v. Commissioner*, 68 T.C. 800 (1977). However, section 1251(e)(4)(A) has no de minimus provision excluding from its application those taxpayers who raise horses as a by-product of another business. Therefore, we must find that, for purposes of section 1251(e)(4)(A), Greer was engaged in the trade or business of raising horses; hence in the trade or business of farming.

Once we find Greer to have been engaged in the trade or business of farming during these years his total horseracing business falls within the application of section 1251. By its terms, section 1251 cannot be fragmented.

### Issue 3. Adjustments

Respondent adjusted petitioners' income from the sale of horses, petitioners' section 170(e)(1)(A) calculation concerning the donation of horses, and the amount of petitioners' capital gains to reflect his determination that Greer was engaged in the trade or business of farming. The parties have stipulated that, if Greer was engaged in the trade or business of farming during each of the years in issue, respondent's determination is correct. We so find.

## *Issue 4. J. Gould Bird Prints*

In Tennessee the three essential elements for completion of a gift are intent, acceptance, and delivery. *Pamplin v. Satterfield,* 196 Tenn. 297, 265 S.W.2d 886 (1954). Herein the facts clearly indicate that Greer intended to give the J. Gould bird prints to the University of Tennessee on December 22, 1972, and that he believed the gift was complete at that time. They further indicate that Guthe accepted the prints at that time on behalf of the university.

Because delivery is an essential element of a completed gift, retention by the donor of dominion and control over the subject matter of the gift is ordinarily fatal thereto. *Pamplin v. Satterfield, supra.* Thus, in *Pamplin* where the donor, at the donee's suggestion, kept and wore the subject matter of the gift, a ring, absence of delivery negated the gift.

In contrast, where delivery was to a third party who was not solely the donor's agent so that such delivery placed the subject beyond the voluntary and personal right of recall, delivery was complete. *Ray v. Leader Federal Savings & Loan Association,* 40 Tenn. App. 625, 292 S.W.2d 458 (Ct. App. 1953), cert. denied (1953).

Herein Greer's intent is unmistakable. He intended delivery of the prints on December 22, 1972. His retention of the prints was not for his benefit or use thereof, but to facilitate proper transport of the prints to the university. Both Greer and the university considered the prints to belong to the latter at year end. We see no need to chastise petitioners because Greer accepted the onus of transporting the prints. We note that an employee of Greer attempted physical delivery of the prints during the taxable year 1972 on two or three occasions. He was unsuccessful because the university's offices were closed for the holiday season.

## *Issue 5. Rental Expenses*

Pursuant to her doctor's advice that wintering in a mild climate would be beneficial to Russell Greer's health, Greer rented an apartment in Florida for the winter months of 1970. Petitioners deducted the rental expense as a section 213 medical expense.

Respondent disallowed this deduction contending that such

expense was a section 262 nondeductible personal expense and, therefore, not allowable under section 213.

We find the present factual situation indistinguishable from *Commissioner v. Bilder*, 369 U.S. 499 (1962). Both cases involved a chronically ill taxpayer whose doctor recommended wintering in a mild climate.

Petitioner attempts to rely on *Kelly v. Commissioner*, 440 F.2d 307 (7th Cir. 1971). However, therein the hotel expenses allowed to the taxpayer arose when he was overcome by a sudden illness while away from home and, after discharge from the hospital, was advised by his doctor not to attempt to journey home. Herein there is no suggestion that Russell Greer was stranded due to a significant change in her condition while in Florida. Rather, like *Bilder*, the expenses were occasioned by her wintering in Florida upon the advice of her doctor. For this reason we do not find that the rental expense fits within the section 213(e) definition of expenses incurred for medical care.

*Decision will be entered under Rule 155.*