JOSEPH L. ALIOTO and ANGELINA G. ALIOTO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Alioto v. Commissioner
Docket Nos. 2251-77, 566-79.
United States Tax Court
T.C. Memo 1980-360; 1980 Tax Ct. Memo LEXIS 227; 40 T.C.M. (CCH) 1147; T.C.M. (RIA) 80360; September 8, 1980, Filed Charles A. Lane, for the petitioners. Jerome Borison, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the years and in *228 the amounts as follows: Year
Deficiencies
Ended
in Income Tax
1967
$240,128.72
1969
7,050.66
1970
10,350.51
1972
23,279.00
1973
166,493.00
1974
5,758.00
No deficiency was determined for the year 1968. However, the income for this year is involved in this case because of claimed charitable deduction carry-overs. Many of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following: (1) Whether contributions of certain real property were made by petitioners in December of 1967 and December of 1968 at the time certain deeds were executed, or were made in 1968 and 1969, respectively, either at the time these deeds were recorded or at the time they were physically delivered to the donees; and (2) what is the fair market value of the real property donated by petitioners to certain charities at the dates the gifts were made.
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Joseph L. Alioto (petitioner) and Angelina G. Alioto resided in San Francisco, California, at the time of the filing of their petitions in this case. Petitioners filed joint Federal *229 income tax returns on the cash basis of accounting for each of the calendar years 1967, 1969, 1970, 1972, 1973, and 1974 with the Internal Revenue Service Center in Ogden, Utah, or Fresno, California. On June 3, 1970, petitioners filed amended tax returns for the calendar years 1967 and 1968. Petitioner is a lawyer and during the earlier years here in issue was actively engaged in the practice of law in San Francisco, California. Petitioner attended Sacred Heart High School (Sacred Heart) and St. Mary's College (St. Mary's) in San Francisco. He also attended law school at Catholic University of America (Catholic University) in Washington, D.C. Petitioners' sons attended St. Ignatius High School (St. Ignatius) in San Francisco. All of these institutions are charitable or educational organizations, contributions to which are deductible under section 170, I.r.c/. 1954. [1]
In 1961, 1962, 1963, and 1964 petitioner made gifts of real property to St. Mary's. The property given to St. Mary's during these years was located in Placer *230 County, California, and was referred to during the trial of this case as the Rainey Ranch property. The Rainey Ranch was contiguous to other property owned by petitioner in Placer County, California, which petitioner had originally acquired in 1957 along with some of his clients. This property is referred to in the record as the Cranston Ranch. The Cranston Ranch as originally acquired consisted of approximately 3,400 acres. However, after two or three years of joint ownership, the property was divided among the joint owners and petitioner thereafter owned the entire interest in 744.10 acres of this property. For convenience this 744.10 acres was referred to in the record as the Cranston Ranch. The 744.10 acres which petitioner received in the division was adjacent to the Rainey Ranch property then owned by petitioner. On March 23, 1966, petitioner purchased 2,415.64 acres of real property located partially in Nevada County and partially in Placer County, California, from Guy Nile and Grace Olive Robinson. This property has been referred to in the record as the Robinson Ranch, this terminology being particularly given to the portion of the property in Nevada County, California. *231 During the years 1965 and 1966, petitioner contributed the indicated undivided interests in the Cranston Ranch property located in Placer County, California, to the donees as shown: Percentage of Interest
Contributed
Donee
1965
1966
St. Mary's College
15
18-1/8
Ignatian Corp.
St. Ignatius High School)
12-1/2
0
Catholic University of
America
15
18-1/8
Salesian Boys Club
3-1/8
Festival Foundation
3-1/8
Prior to the making of the gifts to St. Mary's, St. Ignatius, and Catholic University, petitioner had been approached by representatives of these schools requesting him to make contributions. In the case of St. Ignatius and Catholic University, the requested contributions were for building programs. Petitioner in reply to these requests had stated that he would make gifts at various times of real property. Petitioner had explained to representatives of the various charities that these properties were contiguous to developments that he was undertaking with associates and that he would be happy to manage the properties for them if they wished. For instance, in a letter dated December 30, 1965, addressed to Reverend Harry V. Carlin, *232 S.J., St. Ignatius High School, petitioner stated in part as follows: Mrs. Alioto and I have today signed a deed of a 12.1/2% undivided interest in approximately 800 acres of land in Auburn, California in favor of the Ignatian Corporation. This property directly adjoins the Auburn Country Club golf course and is part of a 3,400 acre development I am undertaking with some of my real estate partners. Similarly situated property, 20 miles away, not directly adjacent to the Alta Sierra gulf course was recently sold for $900 an acre. I believe the value of this acreage is at least $1,000 an acre, and your percentage interest represents approximately 100 acres. After the deed has been recorded I shall be happy to sit down with any of your property managers to explain the posture of the properties. I shall also be happy to manage these properties for you, should you wish it, to the end that maximum return may be secured. In a letter dated May 17, 1965, to Brother T. Michael, F.S.C., St. Mary's College, petitioner stated: I am enclosing the final deed on the Auburn property which now vests in the College an undivided 400 acres in the described parcels of 1600 acres. Real estate *233 values are moving well in the area. I am preparing a detailed description of the property with a recommendation for its future use and resale. You might want to submit such a report to your Board. Meanwhile, with your permission, I will continue to manage the properties, advising you of the developments in the area. The statement in the letters to the various charities with respect to petitioner's managing the properties was in accordance with petitioner's oral understanding with the charities that he would manage the properties, initially paying the taxes and expenses in connection therewith, and when income was received from the properties he would be reimbursed for these items. Petitioner and his associates were planning a development in the area in which the properties donated by petitioner to the various charities were located. Starting in the early 1960's, a country club (the Auburn Country Club) including a golf course with a number of lakes thereon had been developed by petitioner and his associates near or adjacent to the properties donated to the charities. Petitioner himself owned and continued to own properties directly surrounding the Auburn Country Club that *234 adjoined some of the properties that he gave to the various charities. Petitioner had plans to develop these properties into either a residential or recreational-residential area. In pursuance of this plan, petitioner and an associate had developed various tentative plans for use of the property but had never filed such plans for approval with either the Placer County or the Nevada County Planning Commission. As of the years 1966 through 1969 the properties owned by petitioner in both Placer County and Nevada County, California, parts of which were contributed to various charitable donees, were zoned by the respective counties as "unclassified." The unclassified zoning designations in these counties at that time generally meant that the property was rural property and that one residence or dwelling was permitted to be built for every 5 acres of property. In later years, starting in approximately 1971, the counties changed the zoning restrictions on these properties and increased the acreage required for each residence. At the time of the trial of this case active steps were being taken to have the zoning of the property in Placer County changed to permit greater density of construction. *235 On December 29, 1967, petitioners executed four separate deeds which were notarized by Marie L. Duggan, Notary Public. Ms. Duggan was employed in petitioner's law office. One of these deeds transferred to St. Mary's an undivided 15 percent interest in the 744.10 acres of the Cranston Ranch located in Placer County. Another of these deeds transferred an undivided 20 percent interest in the 1,108 acres of the Robinson Ranch located in Nevada County, California, to Sacred Heart. The third of these deeds transferred a 20 percent undivided interest in the 1,108 acres of the Robinson Ranch in Nevada County to St. Ignatius, and the final deed, executed on December 29, 1967, transferred a 20 percent undivided interest in the 1,108 acres of the Robinson Ranch located in Nevada County to Catholic University. Each of the three deeds transferring an undivided interest in property in Nevada County, California, contained a reference to "see 'NOTE' attached." In each instance the note attached read: "NOTE" And in addition thereto, an easement to Auburn Valley Golf Course, over contiguous land owned by Grantors, exact route to be designated by Grantors, in their sole discretion, when *236 total development is completed. After executing the four deeds on December 29, 1967, petitioner placed each of them in his personal file marked with the name of the donee. On July 11, 1968, the deed to St. Mary's of an undivided 15 percent interest in the Cranston Ranch in Placer County which had been executed by petitioner on December 29, 1967, was recorded. Petitioner had mailed the deed to the County Recorder's Office of Placer County with a letter dated July 9, 1968, enclosing a check for the recording costs and the property transfer tax. In the letter petitioner requested that the deed be returned to him after it had been recorded. With a cover letter dated October 1, 1968, petitioner mailed to St. Mary's the deed executed on December 29, 1967. The letter which was addressed to Brother T. Michael, F.S.C., St. Mary's College, states: In accordance with the program I had previously discussed with you, I have deeded an additional 120 acres of land which I own near Auburn, California, to Saint Mary's College. So long as you wish me to do so, I shall continue to manage the properties for you in order that we may secure the best possible sales price. My office would be glad *237 to discuss the present status of these properties with any person you designate for that purpose. This deed was executed on December 29, 1967 but was not recorded until July 12, 1968. [sic] The deeds to the undivided interests in the Robinson Ranch property to Sacred Heart, St. Ignatius, and Catholic University were each recorded in Placer County on July 12, 1968. On September 26, 1968, petitioner addressed a letter to Reverend John P. Whalen, Catholic University of America, enclosing the deed of the 20 percent undivided interest of the Robinson Ranch property in Nevada County to Catholic University. With a letter dated October 1, 1968, to the Reverend Edward McFadden, S.J., St. Ignatius High School, petitioner enclosed the deed, executed December 29, 1967, of an undivided 20 percent interest in the Nevada County Robinson Ranch to St. Ignatius. With a letter dated October 1, 1968, addressed to Brother Arnold, F.S.C., Sacred Heart High School, petitioner enclosed a deed transferring a 20 percent interest in the Robinson Ranch in Nevada County to Sacred Heart. Each of these letters read exactly as the letter of October 1, 1968, to Brother T. Michael, F.S.C., St. Mary's College, *238 except as to name of the donee and the acreage of the donation. Although before the end of 1967 petitioner had discussed with a representative of St. Mary's his intent to give an interest in real property to the college and had a similar discussion with a representative of St. Ignatius and a representative of Catholic University, there was no written agreement or pledge made by petitioner with respect to his intended gifts to any of these institutions. At no time during any of the years here in issue was there any formal document executed by petitioner and representatives of any of the donee organizations with respect to the understanding that petitioner would manage the properties for the donees. At no time during the years here in issue was petitioner a trustee for any of these charities. When petitioner originally discussed donation of properties to St. Ignatius, he had invited Father Carlin out to view the property. He had also invited representatives of the other institutions to which he made donations out to view the properties at the time he discussed the making of the donations. The properties shown to the individuals representing the donees were referred to by petitioner *239 as the Auburn Property or Auburn Development. The fact that a part of the property was the Cranston Ranch, a part the Robinson Ranch, and a part the Rainey Ranch was not pointed out to the representatives of the donees. On December 30, 1968, petitioners executed and had notarized by Marie L. Duggan a deed transferring to St. Mary's an undivided 10 percent interest in specifically described property in Nevada County, California. The property described was the 1,108 acres of the Robinson Ranch located in Nevada County, California. On December 30, 1968, petitioners executed and had notarized by Marie L. Duggan a deed transferring to St. Ignatius a 10 percent undivided interest in specifically described property located in Nevada County, California. This property likewise was the 1,108 acres of the Robinson Ranch located in Nevada County, California.On December 30, 1968, petitioners executed and had notarized by Marie L. Duggan a deed transferring to Catholic University a 20 percent undivided interest in specifically described property in Nevada County, California. The property described was the 1,108 acres of the Robinson Ranch which was located in Nevada County, California. Each *240 of these deeds referred to an attached note. The attached note on each deed read: "NOTE" And in addition thereto, an easement to Auburn Valley Golf Course, over contiguous land owned by Grantors, exact route to be designated by Grantors, in their sole discretion, when total development is completed. After executing these deeds, petitioner placed the deed to St. Mary's in his personal file marked in the name of that donee and likewise placed the deed for St. Ignatius in his personal file marked for that donee and the deed to Catholic University in his personal file marked with the name of that donee. Each of these three deeds was recorded in Nevada County, California, on February 18, 1969. The stamp on each deed, in addition to showing the volume and page where the deed was recorded, stated: "Official records recorded at request of Joseph L. Allioto." Petitioner sent the deeds as recorded to each of the donees by a letter addressed to that donee dated February 25, 1969. The letter addressed to the Reverend Harry V. Carlin, S.J., St. Ignatius High School, and the letter addressed to Brother T. Michael, F.S.C., St. Mary's College, each stated: In accordance with our commitment *241 and notification of several years ago, I am enclosing the final installment on the gifts of property near Auburn, California, to St. Ignatius High School [St. Mary's College]. We are preparing to sell these properties and will contact you when we have received definite offers. No representative of either St. Ignatius or of St. Mary's knew the specific property which petitioner intended to transfer to the high school or the college, or the specific interest in the property he intended to transfer until receipt of the deed making the transfer. However, when Father Carlin visited petitioner in 1968 sometime around Christmas, or New Year's Day 1969, petitioner stated to him that he was making a further transfer of property to St. Ignatius. Petitioner did not communicate to any representative of St. Mary's in the latter part of 1968 the interest in or description of the property which was to be transferred to the college. Petitioner, when he agreed to transfer in succeeding years certain real property to Catholic University, St. Mary's, and St. Ignatius, had in mind making the transfers in years in which he had sufficient income to cause the charitable deduction for the transfer *242 to be most beneficial. However, petitioner did not explain to the representatives of any of the charities the basis on which he would determine the amount of property to be transferred in any specific year, or the years in which the transfers would be made. Petitioner received monthly statements with respect to income from his law practice from Ms. Duggan. Sometime in December, petitioner would inquire of Ms. Duggan as to the income situation for the month of December and toward the end of the month would ask her about the deductions which would probably be taken against that income. Petitioner would then make some estimate of his probable net income for the year and calculate 30 percent of that estimated income and determine the interest in property he wished to give to the charities on the basis of the resulting figures. With this information in mind, petitioner on December 29, 1967, executed the deeds to St. Mary's, St. Ignatius, Catholic University, and Sacred Heart heretofore referred to. This same pattern was followed by petitioner prior to the execution of the three deeds on December 30, 1968, to St. Mary's, St. Ignatius, and Catholic University. In 1970, the various *243 institutions to which petitioners had donated undivided interests in the Cranston Ranch during the period 1965 through 1969 deeded approximately 99 acres of the property to the Castlewood Corporation, which was one of the venturers in the planned unit development around the Auburn Country Club, so that sewage ponds could be built on the property. The institutions were not paid for transferring this property for use as a sewage disposal area. The properties comprising the Rainey, Cranston, and Robinson ranches had been used for winter cattle grazing before they were acquired by petitioner. After petitioner acquired these properties, and even after interests in these properties were donated to the various charities, certain portions of the properties were leased out as pasturage for winter cattle grazing. Petitioner arranged these leases on behalf of himself and the charities. When the funds from the leases were collected, he deducted expenses, including taxes, and turned over the portion of the balance of the moneys received from the leases to each of the charitable institutions in proportion to the interest then owned in the property by the institution. The following schedule *244 sets forth sales of certain properties located in Placer County and El Dorado County, California, in the general vicinity of the Cranston Ranch, during the period from August 2, 1966, to December 30, 1969: Total
Total
Price Per
Date
Grantor
Grantee
Consideration
Acreage
Acre
8/2/66
Brewer Gibson
C. Wulff
$224,000
1,600
$140
8/2/66
Brewer Gibson
C. Wulff
540,000
810
667
10/1/69
Payne
Silberman-Glaser
166,500
554
312
11/26/69
Chappie
Trans-Land
180,000
310
580
12/30/69
Auburn Lake
Trans-Land
642,000
756
849
10/31/69
Brazil
Trans-Land
132,300
200
661
10/16/68
Bowen
El Dorado
282,000
664
425
10/16/68
L. Niegel
El Dorado
251,302
591
425
At the time of sale, each property listed above was being used primarily for cattle grazing, although thereafter developments were placed on some of the properties. There were differences among the properties above listed not only as to size but also as to location with respect to the nearest city or town, road access, topography, zoning, availability of water and electricity, improvements, and proximity to rivers. The properties designating the grantor as *245 Chappie, Auburn Lake, Brazil, Bowen, and L. Niegel have all been, since the date of the transfer listed above, used for development in a way generally similar to the development petitioner had intended for the Cranston Ranch property. On May 1, 1973, petitioner, on his own behalf and as agent for the charities, entered into an agreement with Mr. L. P. Odenthal, granting Mr. Odenthal an option to purchase the real property in Placer County, California, adjacent to the Auburn Country Club. The property subject to the option included the Cranston Ranch property which petitioner had donated to the various charities. The option provided for a price of $1,200 per acre. By its terms the option was to be effective for a period of 3 years. The option was not exercised within the 3 years. However, subsequent options were granted with respect to the properties. There were no public roads through the Cranston Ranch property, but the property bordered on a public road and a private dirt road ran through the Cranston Ranch property to the Auburn Country Club. By 1973 the Cranston Ranch property had been rezoned for one dwelling per 160 acres. Therefore, at the time the option was granted *246 to Mr. Odenthal to purchase the Cranston Ranch property it was necessary to have a change in zoning of the property for its development to be economically feasible. Petitioner was of the opinion that the change in zoning on this property in 1971 and subsequent years was due to a dispute he had with respect to an attorney's fee with officials of Placer County, California. When Mr. Odenthal took the option on the property and other options were granted at its expiration, the idea was that the development of the property would proceed after obtaining a zoning change. At the time petitioner purchased the Robinson Ranch on March 23, 1966, for $400,000, or $166 per acre, the property was divided by the Bear River. The Nevada County part of the property was on one side of the river and the Placer County part on the other side. The part of the Robinson Ranch property located in Placer County was adjacent to other properties owned by petitioner and to the Cranston Ranch property which was donated to the various charities. The Placer County part of the Robinson Ranch property had available access to the Auburn Country Club and to the highway adjoining the private road to that club. At *247 the time of the purchase, there was no bridge over the Bear River and no road from any part of the Nevada County property to the Bear River, or from the Bear River to any road connecting with the Auburn Country Club. In order to go from the Nevada County property to the Auburn Country Club by automobile, it was necessary to drive around a loop to avoid the Bear River, a distance of approximately 30 miles. At the time the Robinson Ranch was acquired, it was zoned unclassified which would have permitted one residential unit for every 5 acres of land. Any development of the property would have required the filing of some development plan with the Nevada County Planning Commission, and this was never done. No application has ever been filed with that planning commission to include any part of the Nevada County Robinson Ranch within a planned unit development. The actual distance between the Auburn Country Club and the Robinson Ranch in Nevada County was only approximately 2 miles, but for any form of motorized access, or even when the Bear River was high, foot access would have required a bridge to be built across the Bear River. To build a bridge which could be used year-round would *248 have been a very expensive undertaking. Mr. Laurence Curtola, an associate in certain real estate developments with petitioner, investigated placing a crossing on the river with a heavy construction base carriage of the type used by railroads. He investigated procuring some form of base which could be removed at times of heavy drainage.In this way he thought a crossing of the river for approximately 9 months out of the year might be provided at a price of between $20,000 and $25,000. The property on the Nevada County part of the Robinson Ranch near the river was very steep. Much of the area was unsuitable for buildings. The carriagetype bridge that Mr. Curtola investigated was never in fact placed across the Bear River and no improvement work was ever done on the Robinson Ranch in Nevada County. Sometime in 1979, the Robinson Ranch property in Nevada County donated to the various charities was sold for approximately $375 an acre. The purchaser brought the property for use as a cattle ranch. In the sale, the buyers acquired no right of access to the Auburn Country Club or golf course or use of the sewage disposal area or roads on the Cranston Ranch property. The following *249 schedule lists certain sales of properties during the period April 7, 1965, through October 1, 1969, in Nevada County and in Placer County located in fairly close proximity to the Nevada County Robinson Ranch property donated to the charities: Price Per
Date
Grantor
Grantee
Consideration
Acreage
Acre
4/7/65
Corcoran
Rowley
$ 30,000
215
$ 140
1/6/66
Hubbard
Didion
105,600
320
330
1/18/66
Moody
Andrade
125,000
720
174
8/2/66
Brewer-Gibson
Minnis-Fay 500,000
1,747
286
8/2/66
Brewer-Gibson
Weilff
224,000
1,600
140
9/23/69
Payne
Silberman
166,500
554
312
5/ 27/66
Gladding
Arenchild
132,000
850
155
11/15/68
Clark
Bancroft
297,500
1,300
229
7/31/69
Struckman
Sise
125,000
237
530
4/1/66
Robinson
Alioto *
400,000
2,415
166
During the period 1965 through 1973, property in the general area of the Cranston Ranch in Placer County, California, and the Robinson Ranch in Nevada County, California, was increasing in value at a rate of approximately 10 percent a year. The closest *250 town to these properties was Auburn, the county seat of Placer County. The nearest portion of these properties to Auburn is about 9 miles. However, the properties are within about an hour's drive from Sacramento, California. The nearest access road to the Robinson Ranch, Nevada County, property is approximately 7 miles from State Highway 49 via county roads known as Wolf Road and Garden Bar Road. Wolf Road is paved and Garden Bar Road is paved to a point about 1 to 1-1/2 miles north of the Robinson Ranch property. The last mile or mile and a half is a gravel or dirt road which is county-maintained. On their Federal income tax return for the calendar year 1967, petitioners claimed deductions for donations of unimproved property to each Catholic University, St. Mary's, Sacred Heart, and St. Ignatius in the amounts of $100,000, or a total claimed contribution of $400,000 to the four institutions. Petitioners filed an amended return for 1967 which contained the following statement: Return amended to correct value of unimproved real property donated to various charitable organizations. Taxable income as reported on the original 1967 return does not change since the limitation *251 under 170(b)(1)(A) is applicable to both the original return and this amended return. Value of Property
as Originally
Value of Property
Charity
Reported
as Corrected
Catholic University of
America Law School
$100,000
$169,792
St. Mary's College
100,000
132,000
Sacred Heart High School
100,000
169,792
St. Ignatius High School
100,000
169,792
$400,000
$641,376
On an amended Federal income tax return filed by petitioners for the calendar year 1968 on June 3, 1970, the following statement with respect to the claimed deductions for contributions appeared: Return amended to correct value of unimproved real property donated to various charities, to reflect donation erroneously omitted from return, and to reflect corrected contribution carryover from 1967, as amended. Taxable income as reported on the original 1968 return does not change since the limitation under 170(b)(1)(A) is applicable to both the original return and this amended return. Value of Property
as Originally
Value of Property
Charity
Reported
as Corrected
Catholic University of
America
$127,344
$169,792
St. Mary's College
63,672
84,896
St. Ignatius High School
(erroneously omitted from
original return)
84,896
$191,016
$339,584
*252 Respondent, in his notice of deficiency with respect to petitioners' taxable year ended December 31, 1967, disallowed the entire $400,000 of deductions claimed by petitioners for contribution of unimproved property to Catholic University, St. Mary's, Sacred Heart, and St. Ignatius with the explanation that-- It is determined that the charitable deduction claimed for the value of unimproved land in the amount of $400,000.00 is not allowable, because the property was not deeded to the charitable organizations during the taxable year ended December 31, 1967. In the notice of deficiency with respect to petitioners' taxable year ended December 31, 1969, respondent disallowed petitioners' claimed charitable contribution deduction carryover from 1967 and determined that petitioners had a contribution carryover from the year 1968 in the amount of $30,093 instead of $354,439 as claimed on their return. The computation by respondent of the disallowance of the claimed contribution carryover was as follows: Value of unimproved real estate determined
not to represent an allowable contribution
deduction in 1968. * * *
$339,584
Contributions allowed as a deduction in 1968
per Appellate determination
169,202
Contributions claimed in 1967 determined to be
allowable in 1968. * * *
(184,440)
Disallowed portion of contribution carryover
from 1968
$324,326
*253 In explanation of these figures, respondent stated: It is determined that certain real estate gifted to charity was not a completed transfer during 1968, but was a completed transfer during 1969. It is further determined that the fair market value of said real estate was overstated by $264,876.00. Accordingly, contributions reported on your 1968 amended return in the amount of $339,584.00 are disallowed in 1968 and contributions of $74,708.00 (424.48 acres of land at $176.00 per acre) are allowed in 1969 on the above-mentioned real estate * * *. In further explanation of his determination respondent stated in a footnote as follows: It is determined that the fair market value of the Cranston Ranch is $550 per acre and $188 per acre for the Robinson Ranch: Cranston Ranch - 120 acres at $550 per acre
$ 66,000
Robinson Ranch - 630 acres at $188 per acre
118,440
Allowable Contribution
$184,440
During the other years here in issue, charitable contribution carryovers were computed in accordance with respondent's determination in the notices of deficiencies of contribution dates of the properties and the fair market value he determined for the years 1967 and *254 1969. ULTIMATE FINDINGS OF FACT 1.The date of the gift to St. Mary's of 15 percent undivided interest in the Cranston Ranch property in Placer County, California, which was the subject of a deed executed on December 29, 1967, was July 11, 1968, the date of the recording of the deed. The date of the gifts of an undivided 20 percent interest in the 1,108 acres of Robinson Ranch property located in Nevada County, California, to each Sacred Heart, St. Ignatius, and Catholic University was July 12, 1968, the date on which each of these deeds was recorded. 2. The date of the gifts of an undivided 10 percent interest in the Robinson Ranch in Nevada County, California, to St. Ignatius, a 20 percent interest in this property to Catholic University, and a 10 percent interest to St. Mary's, evidenced by deeds executed on December 30, 1968, was February 18, 1969, the date on which each of the deeds was recorded. 3. The fair market value of the 744.10 acres of the Cranston Ranch property located in Placer County, California, on July 11, 1968, was $850 an acre. The fair market value of the 1,108 acres of the Robinson Ranch property located in Nevada County, California, on July 12, 1968, was *255 $250 an acre. 4. The fair market value of the 1,108 acres of the Robinson Ranch property located in Nevada County, California, on February 18, 1969, was $275 an acre. OPINION Section 1.170-1(b), Income Tax Regs., governing when a charitable contribution is made, states in part: "Ordinarily a contribution is made at the time delivery is effected." The regulation does not specify when delivery of a gift is to be considered effective for income tax purposes. However, in considering when delivery is made, we have generally looked to the state law concerning date of delivery. See Greer v. Commissioner,70 T.C. 294, 304 (1978). Where the gift is of real property made by way of a deed, the state law concerning when a deed is delivered is controlling. Section 1054 of the California Civil Code provides that title to real property passes on delivery of the grant. It states that "A grant takes effect, so as to vest the interest intended to be transferred, only *256 upon its delivery by the grantor." Petitioners recognize that the 1967 deeds were not actually delivered to the grantees until 1968 and that the 1968 deeds were not actually delivered until 1969. However, petitioners rely on the provisions of section 1055 of the California Civil Code for their contention that the deliveries of the deeds here in issue were on December 29, 1967, and December 30, 1968. This Code section provides that "A grant duly executed is presumed to have been delivered at its date." Petitioners state that under this statute there is a presumption that the deeds to the various charities were delivered on the dates of their execution. Petitioners point out that the statute provides a presumption only as to time of delivery and it is still necessary to establish the fact of delivery. This is in accordance with the holding in a number of California cases. See In re Galvin's Estate,144 Cal.2d 354, 250 P.2d 333, 337 (Dist. Ct. App. 1952). Petitioners then conclude that since the deeds here involved were shown to have been delivered, the statute requires *257 the presumption that they were delivered on the date of their execution. Petitioners rely on Gordon v. City of San Diego,108 Cal. 264, 41 P. 301 (1895), and Belli v. Bonavia,167 Cal.2d 275, 334 P.2d 196 (Dist. Ct. App. 1959), in support of their position. Gordon v. City of San Diego,supra, holds merely that the fact that a deed was not acknowledged on the date it bears, standing alone does not overcome the presumption created by section 1055. Belli v. Bonavia,supra, holds that nothing but highly satisfactory evidence of nondelivery should prevail against the presumption of delivery of a deed which is in the grantee's possession. Neither of these cases support petitioners' position in the instant case. Here, we have actual unequivocal evidence of when the deeds were delivered. This evidence shows that the deeds were retained by petitioner, who was the grantor, when they were executed. The deeds executed December 29, 1967, were not recorded until July 1968 and not actually delivered to the grantees until approximately October 1, 1968. The deeds executed on December 30, 1968, were not recorded *258 and actually delivered to the grantees until February 1969. Therefore, the evidence here is absolute of nondelivery of the deeds at the date of their execution. The California law is clear that the presumption created by section 1055 of the Civil Code is rebuttable. See Marple v. Jackson,184 Cal. 411, 193 P. 940 (1920). Under the facts in this record any statutory presumption created by section 1055 of the California Civil Code that the date of execution of the deeds is the date of their delivery is completely rebutted. Petitioners contend that even if the presumption created by section 1055 of the California Civil Code does not establish the dates of delivery of the deeds, there was constructive delivery of the deeds on the dates of their execution under section 1059 of the California Civil Code. This section provides: Sec. 1059. Constructive Delivery of Grant. Though a grant be not actually delivered into the possession of the grantee, it is yet to be deemed constructively *259 delivered in the following cases: 1. Where the instrument is, by the agreement of the parties at the time of execution, understood to be delivered, and under such circumstances that the grantee is entitled to immediate delivery; or, 2. Where it is delivered to a stranger for the benefit of the grantee, and his assent is shown, or may be presumed. Petitioners argue that the promises that petitioner had made to the various charitable institutions to give to them various interests in property in the future effectively meant that he lost control over the deeds once they were executed. We have examined the facts in this record with great care and have concluded that although petitioner had a general promise to donate property to the various charities at times to be selected by him over a period of years, he had not made any commitment as to the time of the giving of the property. Also, he had not made a commitment as to what interest in the property would be given at any specific time. We conclude that petitioner has failed to establish the existence of any trust, expressed or implied, which resulted in constructive delivery of the deeds when they were executed and placed in *260 his personal files in his office. At this time petitioner had in no way lost control over the deeds. Under the facts here shown, petitioner would have violated no trust had he destroyed the deeds prior to the time they were recorded. He had parted with nothing by merely executing the deeds.See Miller v. Jansen,21 Cal.2d 473, 132 P.2d 801, 803 (1943), in which the Court stated: Possession by the grantee gives rise to an inference that the instrument was duly delivered. Ward v. Dougherty, 75 Cal. 240, 17 P. 193, 7 Am.St.Rep. 151; Lewis v. Burns, 122 Cal. 358, 55 P. 132; McGorray v. Robinson, 135 Cal. 312, 313, 67 P. 279; McDougall v. McDougall, 135 Cal. 316, 67 P. 778; Thomas v. Fursman, 177 Cal. 550, 171 P. 301; Central Trust Co. v. Stoddard, 4 Cal.App. 647, 88 P. 806; Thompson v. McKenna, 22 Cal.App. 129, 133 P. 512; Burkett v. Doty, 32 Cal.App. 337, 344, 162 P. 1042; Drummond v. Drummond, 39 Cal.App.2d 418, 424, 103 P.2d 217; James v. James, 80 Cal.App. 185, 251 P. 666; *261 Say v. Crocker First Nat. Bank, 98 Cal.App. 408, 277 P. 146; Wachner v. Richardson, 14 Cal.App.2d 422, 58 P.2d 714; Rivera v. Ron, 51 Cal.App.2d 702, 125 P.2d 517. But possession by the grantor has been uniformly held to make out a case of nondelivery, unless actual delivery be shown and that the grantor's possession was merely for safekeeping or similar purpose. Tweedale v. Barnett, 172 Ca. 271, 156 P. 483; Ostrom v. De Yoe, 4 Cal.App. 326, 87 P. 811; Lample v. McDougall, 103 Cal.App. 779, 285 P. 328. Compare Marple v. Jackson, 184 Cal. 411, 193 P. 940; Shaver v. Canfield, 21 Cal.App.2d 734, 70 P.2d 507. See, also, Orris v. Whipple, 224 Iowa 1157, 280 N.W. 617, 129 A.L.R. 1. In Wood v. Emig,58 Cal.2d 851, 137 P.2d 875, 877 (Dist. Ct. App. 1943), the Court stated with respect to a deed executed by parents in favor of their children and retained by the parents: "The deed to the children of plaintiffs executed in 1936 could have no affect until its delivery; it could have been destroyed at any time." Had petitioner decided to make no transfer *262 to the charities in either of the years 1967 to 1968 or to transfer a different interest in the property to the charities, he could have done so.We therefore conclude on the basis of all the facts in this case that the deeds were not constructively delivered under section 1059 of the California Civil Code on the date of their execution. This record totally fails to show any agreement between petitioner and representatives of the charities that the deeds were understood to be delivered when they were executed and placed in petitioner's files, that the grantor intended them to be operative as of that date or that the grantees were entitled to immediate delivery. All these facts must be shown to indicate constructive delivery of a deed in the possession of the grantor. See Chaffee v. Sorensen,107 Cal.2d 284, 236 P.2d 581 (Dist. Ct. App. 1951). However, in our view the deeds were constructively delivered to the grantees when they were recorded, even though the deeds were physically delivered to the grantees at a later date. In California the recording of the deed creates *263 a presumption of delivery where acceptance of the deed may be presumed. This presumption is particularly strong when the grantor delivers the deed for recording. The record here is clear that the charities had consented to receiving the donations when they would be made. Since the charities had agreed to accept the donation of interests in property from petitioner, he could not rescind the deeds once they had been recorded. We therefore conclude that the date of delivery of each of the deeds to the charities is the date the deeds were recorded. See Hill v. Donnelly,43 Cal.2d 47, 110 P.2d 135 (Dist. Ct. App. 1941), and Hill v. Donnelly,56 Cal.2d 837, 132 P.2d 867, 870 (Dist. Ct. App. 1942). Having concluded that the gift to St. Mary's of a 15 percent undivided interest in the 744.10 acres of the Cranston Ranch located in Placer County, California, was made on July 11, 1968; the gift of a 20 percent undivided interest in the 1,108 acres of the Robinson Ranch located in Nevada County, California, to each Sacred Heart, St. Ignatius and Catholic University was made on July 12, 1968; and the gift of a 10 percent undivided interest in the Robinson *264 Ranch located in Nevada County, California, to each St. Mary's and St. Ignatius, and a 20 percent undivided interest in this property to Catholic University was made on February 18, 1969, it is necessary to determine the fair market value of each of these gifts as of those respective dates. Petitioners contend that the value of the Cranston Ranch property donated to St. Mary's in July 1968 was $1,200 per acre. Petitioners support their contention by reliance on the testimony of petitioner and Mr. Curtola and on an option to purchase this property granted in 1973. Petitioner testified to a value of $1,100 per acre and Mr. Curtola testified to a value for this property of $1,200 per acre. Both petitioner and Mr. Curtola had been involved in developments in the general vicinity of the Cranston Ranch. However, neither of them gave any specific details as to the sale of other property. Petitioner did make some reference to some property 20 miles away from the Cranston Ranch which had sold in late 1965 for $900 an acre. According to petitioner, this property was the Alta Sierra property adjoining a golf course. There is no showing in the record of the comparability, if any, of the *265 Alta Sierra property to the Cranston Ranch property as it existed in 1968. Certainly, if the Alta Sierra property were 20 miles closer to Sacramento it would be more valuable for that reason alone.Also, insofar as this record shows, the Alta Sierra property was completely developed into a subdivision at the time of the sale. In 1968 no plan had even been filed with Placer County seeking the right to develop the Cranston Ranch property. The only testimony in the record in regard to the sale of the property near the Alta Sierra Club is petitioner's statement-- You see, Alta Sierra, we sold lots, not buildings. We developed lots and sold lots, as such. And they were selling for approximately eight or nine -- the average price of the Alta Sierra -- an Alta Sierra was approximately $8,000.00 or $9,000.00. The development costs were approximately -- overall, we averaged development costs were approximately $4,500.00, which left about $3,500.00 for the raw land after it was all developed. * * * If in fact petitioner was referring to a price of $3,500 for 5 acres, the amount per acre would have been $700 and not $900. Petitioner referred to two other developments in the area which *266 in his opinion were comparable developments. One was the Boise Cascade Development and the other Lake of the Pines. However, again he made no showing of where these developments were in relation to the Cranston Ranch. He did state that these projects ran into difficulty because the development was too rapid.In our view, the estimate made by petitioner is based on no foundation other than his unsupported opinion. Mr. Curtola gave no basis for his opinion other than his experience in real estate development. Petitioners argue that the opinion of petitioner and the opinion of Mr. Curtola are supported by an option given in 1973 to Mr. Odenthal to purchase the Cranston Ranch property at $1,200 per acre. An option of course is not a sale. The record shows that the option was never exercised and that in fact there have been renegotiations and extensions of the option. Although the record is not completely clear, apparently the option price of $1,200 an acre was conditioned upon the obtaining of a more favorable zoning for the property than existed in 1973 when the option was given.The record shows that property in the general area of the Cranston Ranch was increasing in value from *267 1965 through 1973 at the rate of approximately 10 percent a year. On this basis, even if the $1,200 an acre had been a conditional sale based on obtaining zoning comparable to that in existence in July 1968 when petitioners made the gift of an interest in the Cranston Ranch to St. Mary's, the indication would be a value of the property of substantially less than $1,200 an acre at the date of the gift. Respondent's expert witness testified to a value of the Cranston Ranch property in July 1968 of $800 per acre. In making this valuation, respondent's expert concluded that the highest and best use of the property at the date of the gift was cattle grazing. Also, he stated that he had taken into consideration the potential for development of the property into subdivisions. Respondent's expert relied to a large extent on sales of properties he considered comparable. However, the only sale to which he referred which had a price close to $800 an acre was a sale on December 30, 1969, by Auburn Lake to Trans-Land of 756 acres at a price of $849 an acre. Respondent's witness himself testified that this sale was of property which was more comparable to the Cranston Ranch property than any *268 of the other sales which he had found in the general area of the Cranston Ranch property. He testified that this property had more road frontage and was generally better located than the Cranston Ranch. The description contained in the report of respondent's expert witness with respect to this property is as follows: (Auburn Lake Company to Trans-Land Company) Sold 12-30-69 for $849/acre for 756 acres located in the east portion of Auburn Lake Trails Subdivision north of Highway 193. Is now developed into part of this residential subdivision which has a large amount of frontage on the N/L of Highway 193. It is not completely clear from the record, but apparently the property involved in the sale from Auburn Lake to Trans-Land did not have the proximity to a country club that the Cranston Ranch property had. However, again it appears that this property was further along with development than the Cranston Ranch property. Also, the sale by Auburn Lake to Trans-Land occurred on December 30, 1969, over a year after the valuation date of the Cranston Ranch property of July 1968. In the area in which the Cranston Ranch property was located, property values were increasing between *269 1968 and 1969. However, we have concluded that the nearest representative sale we have to the Cranston Ranch property is the 1969 sale from Auburn Lake to Trans-Land. In our view any increase in value of property between 1968 and 1969 would be at least to some extent offset by the proximity of the Cranston Ranch property to the Auburn Country Club. If the option price in 1973 is to be given any weight, it would indicate a value in 1968 of the instant property of an amount approximating the price at which Auburn Lake sold the 756 acres to Trans-Land in 1969. Considering the evidence as a whole, we have concluded that the fair market value of the Cranston Ranch property located in Placer County, California on July 11, 1968, was $850 an acre. Petitioners make much of the argument that petitioner was to manage the property and initially pay any taxes and development costs which he would recoup when the charity received the income from the sale of the property. While to the charities petitioner's agreement to manage the properties as long as the charities wished him to do so was valuable, this extra benefit was not a benefit that ran with the land. It was merely a personal arrangement *270 between petitioner and the charities. Therefore, in determining what a willing buyer would pay a willing seller for the property, it should not be assumed that with the property would go the right to have petitioner manage the property and make the initial outlay for development costs. We have therefore not considered this aspect of petitioner's understanding with the charities to be helpful in determining the fair market value of the property. The property comprising a part of the Robinson Ranch which was in Nevada County had been purchased by petitioner a little over 2 years prior to the 1968 gifts to various institutions and a little less than 3 years prior to the 1969 gifts. The overall purchase price of the Robinson Ranch, part of which was in Nevada County and part in Placer County, was $166 an acre.However, the record clearly shows that the Placer County portion of the Robinson Ranch was more valuable than the Nevada County portion. The Nevada County portion was across Bear River from the Placer County portion. Therefore, although the Nevada County portion of the Robinson Ranch was, in actual distance, only 2 to 3 miles from the Auburn Country Club, it was divided from *271 that club by a river. This property was 30 miles from the Auburn Country Club without access across the river. The record shows that a bridge and a road to bring the Nevada County property within 2 to 3 miles from the Auburn Country Club would be a very expensive improvement.Petitioner estimated the value of the portion of the Robinson Ranch in Nevada County given to the various charities at $800 an acre at the date of each of the gifts, and Mr. Curtola estimated the value of this property at $1,200 an acre. Both petitioner and Mr. Curtola assumed close access of the property to the Auburn Country Club and its development as a unit with the Placer County property adjoining the Auburn Country Club. Insofar as this record shows, neither petitioner nor Mr. Curtola gave reasonable consideration to the expense of bringing the property within close proximity to the Auburn Country Club. Because of the method used in estimating values by petitioner and Mr. Curtola, we consider their opinion of the value of the Robinson Ranch in Nevada County to be of little value. The record shows that when the deeds to the Robinson Ranch property in Nevada County were sent to the donees in 1969, petitioner *272 stated that he was "preparing to sell these properties and will contact you when we have received definite offers." There is no evidence in the record as to the amount per acre of any offers received or why the property was not sold at that time. Respondent's witness estimated the value of the Nevada County property at July 12, 1968, to be $210 an acre and at February 18, 1969, to be $225 an acre. His valuation was on the basis of the highest and best use of this property being for cattle grazing. Respondent's witness based his valuation on a number of sales of properties in the general location of the Robinson Ranch made from April 7, 1965, through July 31, 1969. Although the witness was not as specific as to the sales he considered most representative of the value of the Robinson Ranch property as he was with respect to the Placer County property, he did indicate that he considered the sale made on November 15, 1968, from Clark to Bancroft at $229 an acre for 1,300 acres to be probably the most representative sale. [2] Respondent's witness gave no consideration to the note attached to the deeds transferring the Robinson Ranch property to the charities providing for access to *273 the Auburn Country Club. Whereas the agreement petitioner had with the charities to manage the property for them was a personal agreement, the provision in the deeds was a right which it would appear could be transferred by the donee. Respondent's expert witness testified that he was not aware at the time he appraised the property of the agreement in the deeds conveying the property to the charities granting an easement over other land petitioner owned to the Auburn Country Club. However, he stated that had he known this, it would not have altered his opinion with respect to the value of the property because in his opinion the property was not ready for development. Respondent's expert said that to build a bridge across the river would have cost at least several hundred thousand dollars. He stated that the bridge itself would cost almost as much as the Nevada County part of the Robinson Ranch was worth. He further testified that he did not think such a project would be feasible since there was too much other property in the area of the Auburn Country Club which could be developed to warrant the expenditure necessary to build a road and a bridge to provide access from the Nevada *274 County Robinson Ranch property to the club. Respondent's witness also did not consider any additional value that might inure to the Robinson Ranch property because of the fact that it bordered on the Bear River. Respondent's witness pointed out some undesirable features of the Robinson Ranch property in Nevada County, such as the lack of sewage facilities, lack of adequate water and the steep terrain. Also, the maps placed in evidence as a part of *275 the report of respondent's expert witness indicate that more problems would be encountered in developing the part of the Robinson Ranch in Nevada County which was given to the charities than would be encountered in development of the Placer County property. Considering the evidence as a whole, we conclude that even with the costs necessary for a developer to place a bridge across the Bear River there would be a potential value in a right to an easement across other lands of petitioner to the Auburn Country Club. This right, as well as the advantage of bordering on the Bear River, would add some value to the Robinson Ranch in Nevada County over the value of property without these advantages. Therefore, we have concluded that the value of the Robinson Ranch property in Nevada County given to the charities was $250 an acre on July 12, 1968, and $275 an acre on February 18, 1969. Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the years in issue.↩
*. This is the Robinson Ranch in Placer and Nevada Counties purchased by petitioner from the Robinsons.↩
2. Respondent's witness testified in this regard-- Well, I'd say on number 11 there, is a good comparable.It's a large property, contains 1,300 acres.And it has two road frontages. It has McCourtney Road on the northwest side for a distance of about 3/4's of a mile, and it had Perimeter Road, which is a dirt road, which goes through the central portion of the property. It's in Nevada County. And it's only a mile north, northwest of the subject property. * * * it's not on the Bear River, it's about a mile -- about 3/4's of a mile from the Bear River. * * * it doesn't have irrigation -- there is some irrigation water on it, but whether they have water rights, I don't know. There's a water -- stream running through it.↩