IRWIN M. SUNA AND SUZANN S. SUNA, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Suna v. Commissioner
Docket Nos. 12212-86; 12407-86; 12427-86; 12487-86; 12504-86.
United States Tax Court
T.C. Memo 1988-541; 1988 Tax Ct. Memo LEXIS 570; 56 T.C.M. (CCH) 720; T.C.M. (RIA) 88541; November 29, 1988. Mark B. Cohn and Daniel R. McCarthy, for the petitioners. Susan M. Gray, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: In these consolidated proceedings, respondent, by statutory notices, determined deficiencies in petitioners' Federal income taxes for calendar year 1982, as follows: Additions to Tax
Petitioners
Deficiency
6653(a)(1) [2]
6653(a)(2)
6659(a)
Irwin M. and
$  8,234.00
$   411.70 *
$  2,109.00
Suzann S. Suna
Robert E. and
4,608.00
230.40 *
1,382.40
Darlene K. Ward
Ira and
29,097.60
1,454.88 *
7,848.87
Ruth Martel
Meir and
37,987.00
1,899.35 *
10,731.60
Rebeka Benit
Howard and
10,512.10
525.61 *
2,668.23
Selma Greenberg
After concessions, the issues *572 for decision are: (1) Whether petitioners are entitled to charitable contribution deductions in connection with an alleged gift of partnership property to a church; (2) whether petitioners are liable for additions to their taxes under section 6653(a); and (3) whether petitioners are liable for additions to their taxes under section 6659(a). FINDINGS OF FACT The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners husbands were partners of Shalom Investments, an Ohio general partnership (Shalom). When they filed their petitions in this case, petitioners Robert E. and Darlene K. Ward, husband and wife, resided in Fairview Park, Ohio; petitioners Ira and Ruth Martel, husband and wife, resided in Ridgeville, Ohio; and petitioners Irwin M. and Suzann S. Suna, Meir and Rebeka Benit, and Howard and Selma Greenberg, husbands and wives, respectively, resided in Elyria, Ohio. All petitioners herein filed their joint 1982 calendar year Federal income tax returns with the Office of Internal Revenue in Cincinnati, Ohio. In 1981, petitioner husband Martel, with nominal contributions from each partner, formed Shalom to assist the Chabad *573 House of Cleveland (Chabad), a religious organization that was deeply in debt. More specifically, Chabad was a center for Jewish students near Case Western University in Cleveland, Ohio, with facilities for dining, lodging and observing Jewish values and religion. The center, which had a fair market value of $ 480,000, was a three-story building with office space, a synagogue, dormitory rooms, kosher restaurant facilities, lecture halls, a child day care center and a gymnasium. However, Chabad had accumulated large operating deficits and desperately needed money. Accordingly, Shalom, using a mortgage loan for $ 228,000 from a pension fund, purchased the center for $ 250,000 and then leased it back to Chabad for a 55-year term. In 1982, however, Chabad failed to pay its rent and defaulted on the lease, leaving Shalom with a mortgage, but no rental income. Consequently, Shalom decided either to sell the center or to donate it to someone with the financial capability to assume the mortgage. Initially, Shalom received a letter from University Circle, Inc. (UCI), a tax exempt organization, in which UCI expressed interest in being the donee. UCI, which represented in its letter *574 that it was a "non-profit corporation" pursuant to section 501(c)(3), was a large organization with 63 member institutions, an annual operating budget of $ 7 million and an approximate book value of $ 8.8 million. However, Shalom did not donate the center to UCI and, instead, commenced negotiations with Eric Solowitch, a title company executive. Thereafter, Shalom authorized Solowitch, in exchange for a $ 6,500 payment equal to one month's rent owing from Chabad to Shalom under the terms of the defaulted lease agreement, to act on their behalf in locating a donee within 30 days for the center. Solowitch, however, had other ideas. First, Solowitch contacted the pastor of Agape Fellowship Church (Agape), a small church in Ashtabula, Ohio. [3] In Agape, Solowitch had found a tiny "storefront" church with a membership of 16 families, most of whom were related and on public assistance. With such a small membership, Agape collected an average of only $ 35 to $ 50 per week in donations and did not pay its pastor a salary. Nevertheless, Solowitch left the pastor with the impression that by accepting the center as a gift, the pastor could sell the headquarters for a profit. *575 Thereafter, acting as escrow agent for the transaction, Solowitch obtained and then recorded in the Cuyahoga County, Ohio, public records, quitclaim deeds from each of Shalom's partners by which they purportedly conveyed their interests in the center to Agape. With the quitclaim deeds, Solowitch received escrow instructions in which Shalom demanded that Solowitch, by October 31, 1982, deliver the deeds to Agape, obtain a receipt from Agape "showing it has received the subject property as a gift," and obtain and record a satisfaction and release of mortgage from the pension fund. However, Solowitch complied only with some of these requirements. First, to document the alleged conveyance, Solowitch offered $ 10,000 to Agape's pastor and thereby obtained the pastor's signature on Board of Trustee minutes and on a receipt for the center. Petitioner Ward drafted the receipt, corporate resolution and minutes and sent them to Solowitch for execution by Agape. However, a signature on the minutes apparently was a forgery and, therefore, only the pastor, without the knowledge of the other members of Agape's Board of Trustees, actually signed the documents. While it is unclear whether *576 Solowitch actually paid the $ 10,000, he also had the pastor sign a purchase agreement by which Agape purportedly would sell the center for $ 510,000 to "Second Claver Investment Company" (Second Claver), a partnership including Solowitch. Finally, Solowitch obtained the pastor's signature on a "Power of Attorney," by which Solowitch purportedly could act on Agape's behalf in selling the center to Second Claver. Although the pastor understood none of these documents or their significance, the pastor, without reading the documents, signed them because his church needed the money. Accordingly, Solowitch had the requisite documents for fabricating a warranty deed from Agape to Second Claver. Consequently, Solowitch executed and recorded a warranty deed by which Agape purportedly conveyed the center to Second Claver. Thereafter, when pressured by Shalom to satisfy the mortgage, Solowitch then applied for a loan and, by offering the center as collateral, obtained a $ 243,000 mortgage loan in the name of Second Claver, supposedly for satisfying the pension fund mortgage and for paying a portion of the center's purchase price to Agape. Although local public records at this point *577 showed Agape as owning the center by quitclaim deeds, Solowitch demonstrated a chain of title to the lender's apparent satisfaction by producing his purchase agreement with Agape. Solowitch, however, did not pay Agape for the center and instead, without informing Agape, simply executed an unsecured demand promissory note from Second Claver to Agape for an amount ($ 315,348.84) of the purported $ 510,000 purchase price, net of closing costs and Shalom's outstanding mortgage to the pension fund. Solowitch, however, never paid or delivered that note to Agape. Indeed, Agape's pastor believed in dealing with Solowitch that the entire transaction was a "scam" and signed the documents because his church needed money. In fact, other than the pastor, Agape had no dealings with Solowitch, knew nothing of the transaction, received no documents of any kind from Solowitch or Shalom relating thereto, and simply did not receive the center in 1982 from Solowitch or Shalom. Indeed, Agape learned of the purported transaction only later from respondent's agents, and thereafter filed a lawsuit against Solowitch in January 1987, seeking approximately $ 3.8 million in damages against Solowitch and *578 his companies. Solowitch finally provided a satisfaction of mortgage to Shalom in February 1983, but not before bouncing a check that he wrote in October 1982, supposedly from funds earmarked in escrow for paying off that mortgage. During this time, Solowitch also withheld documents from and avoided the phone calls of petitioners, who finally threatened him in March 1983 with legal actions. Ulimately, Solowitch and Second Claver defaulted on the $ 243,000 loan, and the lender foreclosed on the center. Notwithstanding these events, petitioners claimed charitable deductions on their 1982 Federal income tax returns for the purported gift of the center by Shalom to Agape. In claiming the deductions, petitioners placed a value on the headquarters of $ 615,000, although the parties later stipulated to a value of only $ 480,000. In the notices of deficiencies, respondent determined that petitioners were not entitled to those charitable deductions and, in addition, determined additions to petitioners' taxes under sections 6653(a) and 6659. OPINION We must decide: (1) Whether petitioners are entitled to charitable contribution deductions in connection with the alleged donation *579 of the Chabad center; (2) whether petitioners are liable for additions to their taxes under section 6653(a); and (3) whether petitioners are liable for additions to their taxes under section 6659(a). Introduction
In challenging respondent's determinations in this case, petitioners largely contend that, notwithstanding Solowitch's betrayal of their trust, the Shalom partnership validly conveyed a gift of real property to Agape under local property law. However, the record in this case overwhelmingly supports respondent's contention that the entire transaction was a "scam." Petitioners are good people who attempted to assist Chabad. However, in seeking relief from a $ 228,000 mortgage, petitioners unfortunately became involved with Solowitch by accepting his $ 6,500 and by authorizing him to act on their behalf in finding a donee for the headquarters. Solowitch then orchestrated this "scam" in order to convert the center to his personal use. With these initial observations, we examine each of petitioners' contentions. Charitable Contribution Deductions
In general, deductions *580 are allowable under section 170 for charitable gifts to religious organizations. Sec. 170(a), (c). [4] The substance and reality of a transaction, and not its form, governs for Federal income tax purposes. Frank Lyon Co. v. United States,435 U.S. 561, 572-573 (1978), and cases cited therein.
Petitioners would have us believe that the transaction herein was, in substance, a gift to Agape. However, we agree with respondent *581 that the transaction herein was, to borrow respondent's characterization, nothing more than a "scam." There is substantial evidence that Solowitch falsified documents and otherwise paid for the signature of Agape's pastor in order to create a paper trail for a purported gift of the real property. In short, Solowitch, while acting on behalf of Shalom, formulated only an illusion of a gift with a subsequent sale, while substantively creating a transaction whereby his own partnership, and not Agape, ultimately received purported legal title to the headquarters. Simply stated, although we do not intend to ignore petitioners' intentions, Solowitch betrayed their trust and no gift actually took place. Further, even if we could conclude, as petitioners contend, that Agape received legal title to the center by virtue of quitclaim deeds, such title merely was a fleeting step in a transaction designed by Solowitch to vest title in his partnership. See, e.g., Gregory v. Helvering,293 U.S. 465 (1935). Indeed, the Agape congregation, or board, knew nothing of the purported gift and with an income of $ 35 to $ 50 per week was not capable, financially, to assume the corresponding *582 $ 228,000 mortgage. Even Agape's pastor, without reading the documents or understanding their significance, questioned the essence of the transaction. In short, we simply cannot give effect on this record to a transaction which merely purported, in form, to be a gift. Frank Lyon Co. v. Commissioner,435 U.S. 561, 572-573 (1978), and cases cited therein. Alternatively, even if we had concluded that the form of the transaction correctly reflected its substance, we would disallow the deduction due to petitioners' lack of donative intent. As used in section 170, charitable contribution is synonomous with the term gift. DeJong v. Commissioner,36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). For Federal income tax purposes, a gift must proceed from "detached and disinterested generosity," with the critical consideration being the transferor's "intention." Commissioner v. Duberstein,363 U.S. 278, 285 (1960). In this case, petitioners failed to show the requisite intention for a gift. First, petitioners would have *583 us believe that Shalom intended to make a gift to Agape. However, we agree with respondent that Shalom simply desired to satisfy its mortgage to the pension fund, not to make a gift. In the present case, the record indicates that Shalom, to begin the transaction, bought the Chabad center for approximately one half of its fair market value, and then leased it back to Chabad. Subsequently, when Chabad defaulted on its lease, Shalom accepted $ 6,500 from Solowitch in order to obtain interim rent to cover the mortgage payment. Thereafter, Shalom granted Solowitch only 30 days to find a donee and, after Solowitch found Agape, issued escrow instructions to Solowitch mandating that he not convey title until he obtained a satisfaction of the mortgage. Then, to complete the transaction, petitioners, in February 1983, finally obtained a satisfaction of the mortgage that was a part of their original 1982 transaction. During this time, Agape is reflected as the donee, but had no knowledge of the transaction or of an obligation to satisfy a $ 228,000 mortgage. On this record, we conclude that Shalom, after buying and leasing the center, simply desired to satisfy the resulting mortgage, and *584 not to make a gift. Consequently, we conclude that petitioners did not make a gift to Agape. See Commissioner v. Duberstein, supra, and cases cited therein. Petitioners cite several Ohio property case precedents to convince us that they made a complete and valid gift of real property in this case. Petitioners ask us to focus solely upon Ohio law in determining whether a gift occurred for Federal income tax purposes. Specifically, we are asked to determine whether the parties properly accepted, intended and delivered a gift under local (Ohio) law. See Greer v. Commissioner,70 T.C. 294, 304 (1978), affd. 634 F.2d 1044 (6th Cir. 1980); see generally Weil v. Commissioner,31 B.T.A. 899, 906 (1934), affd. 82 F.2d 561 (5th Cir. 1936). See also Brotzler v. Commissioner,T.C. Memo. 1982-615. However, those cases, unlike the present case, did not involve a "lack of substance" finding or questions similar to those in Commissioner v. Duberstein, supra, regarding the taxpayers' true intentions. In short, we find the lack of substance in this case too clear, factually, *585 to proceed with consideration of local law. See Corliss v. Bowers,281 U.S. 376 (1930). Accordingly, we do not address petitioners' arguments or their similar contentions under local law that Agape, by filing a lawsuit against Solowitch in 1987 ratified their acceptance of a purported gift in 1982. [5]
On brief, respondent argues that because Solowitch claimed protection and failed to testify under the 5th Amendment, we should draw inferences against petitioners. We find, without considering Solowitch's testimony, that the record supports our finding that Shalom did not make a gift and that the transaction was, in substance, not a gift. In short, petitioners fail to convince us that the transaction herein was, in substance, a gift, or to persuade us that they had the requisite donative intent. Instead, petitioners present a case which, in our view, is not close, and having found that petitioners failed to make a gift, we hold that they are not entitled to the charitable contribution deductions that they claimed in relation thereto. *586 Additions to Tax -- Section 6653(a)
Respondent determined additions to petitioners' taxes under section 6653(a), concerning additions to tax for underpayments attributable to negligence. In this regard, respondent argues on brief that "Shalom's role in this entire transaction was at best that of a willing dupe." We agree with respondent for the following reasons. Petitioners bear the burden of proof on this issue. Rule 142(a); Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Shalom enlisted Solowitch and, as petitioners concede on brief, trusted and relied upon him to find a "donee" to satisfy the mortgage. However, Solowitch, while acting for Shalom, carried out a "scam." Still, the record contains no evidence that petitioners inquired meaningfully into Solowitch's conduct or into the status of the transaction. Petitioners' only action directed at Solowitch was legal action in 1983 after Solowitch withheld documents, failed to return their phone calls, bounced a check for paying off Shalom's mortgage, and failed to comply timely with petitioners' escrow *587 instructions. In addition, we have found that Shalom did not intend to make a gift and, instead, merely intended to satisfy its mortgage on the headquarters. Notwithstanding the foregoing, petitioners claimed charitable contribution deductions on their 1982 returns for "giving" the headquarters to Agape at a value ($ 615,000) greatly exceeding the stipulated value herein ($ 480,000). Under these circumstances, respondent properly determined that petitioners' actions were negligent. On this record, petitioners failed to carry their burden of proof and, accordingly, we sustain respondent's determinations that petitioners are liable for additions to their taxes under section 6653(a). Bixby v. Commissioner, supra.
Additions to Tax -- Section 6659(a)
Respondent determined additions to petitioners' taxes under section 6659(a). An addition to tax under section 6659(a) applies to an "underpayment of the tax imposed by chapter 1 for the taxable year which is attributable to a valuation overstatement * * *." Sec. 6659(a). In turn, a "valuation overstatement" exists if *588 "the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Sec. 6659(c). In case of an underpayment attributable to "charitable deduction property," [6] the addition to tax is 30 percent of the underpayment attributable to the valuation overstatement. Sec. 6659(f). In Todd v. Commissioner,89 T.C. 912 (1987), we held that deductions disallowed because property had not been placed in service did not create underpayments attributable to valuation overstatements. Until an item of property is placed in service, and deductions become available, there is no need to reach the question of value. [7] Analogously, in this case no charitable deduction was allowable because petitioners failed to make a gift. The question of whether a gift has been made is entirely separate from the question of value. Thus, we need not reach the *589 question of valuation of the building. Because the underpayments were not "attributable to" valuation overstatements, no section 6659 addition should be imposed. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated for purposes of trial, briefing and opinion: Robert E. and Darlene K. Ward, docket No. 12407-86; Ira and Ruth Martel, docket No. 12427-86; Meir and Rebeka Benit, docket No. 12487-86; and Howard and Selma Greenberg, docket No. 12504-86.↩
2. All section references are to the Internal Revenue Code, as amended and in effect during the years at issue and all rule references are to this Court's Rules of Practice and Procedure. * 50 percent of the statutory interest on the amount stated as the deficiency, computed from April 15, 1983, to the earlier of the date of assessment or date of payment. ↩
3. Agape later was known as the "True Apostolic Faith Church of Ashtabula." ↩
4. Sec. 170(a) provides, in pertinent part: (a) ALLOWANCE OF DEDUCTIONS. -- (1) General rule. -- There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary. Further, sec. 170(c) provides, in pertinent part: (c) CHARITABLE CONTRIBUTION DEFINED. -- For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of -- * * * (2) A corporation, trust, or community chest, fund, or foundation -- * * * (B) organized and operated exclusively for religious * * * purposes * * *↩
5. In any event, our review of Ohio case law does not convince us that delivery or acceptance occurred under local law.↩
6. The term "charitable deduction property" means "any property contributed by the taxpayer in a contribution for which a deduction was claimed under section 170." Sec. 6659(f)(3)(A)↩.
7. See Chellappan v. Commissioner,T.C. Memo. 1988-208↩.